**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Unisys Corporation, | Civil Action No. _____ |
| Plaintiff, | JURY TRIAL DEMANDED |
| vs. | |
| Leon Gilbert and Michael McGarvey, | |
| Defendants. | |

**UNISYS' MEMORANDUM OF LAW IN SUPPORT OF**
**ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

I.      Introduction ................................................................................................................. 1

II.     FACTUAL Background ............................................................................................... 3

        A.      Unisys and its DWS Business Unit ................................................................ 3

        B.      Defendants' Work at Unisys and Their Confidentiality and Non-Solicitation
                Obligations ..................................................................................................... 4

        C.      The Theft ......................................................................................................... 6

III.    Argument .................................................................................................................. 11

        A.      Unisys has a high likelihood of succeeding on the merits. .................................. 12

                1.      **Unisys will likely succeed on its trade secret misappropriation
                        claims.** ................................................................................................. 12

                2.      **Unisys will likely succeed on its breach of contract claims.** ................ 21

        B.      Defendants' misappropriation and breach of contract will irreparably harm
                Unisys. ......................................................................................................... 24

        C.      The balance of harm weighs decidedly in favor of entering a temporary
                restraining order. ........................................................................................... 26

        D.      The public interest strongly favors entry of a temporary restraining order. ......... 27

        E.      No injunction bond should be required. ............................................................ 28

        F.      The Court should authorize expedited discovery. ............................................. 28

IV.     Conclusion ............................................................................................................... 29

## **TABLE OF AUTHORITIES**

**Cases**

**Page(s)**

*A.M. Skier Agency, Inc. v. Gold*,
  747 A.2d 936 (Pa. Super. Ct. 2000)..................................................................17

*Accurso v. Infra-Red Servs., Inc.*,
  No. 13-7509, 2018 WL 924985 (E.D. Pa. Feb. 16, 2018) ................................12, 13

*Acierno v. Mitchell*,
  6 F.3d 970 (3d Cir. 1993)....................................................................................28

*Air Prods. & Chems., Inc. v. Johnson*,
  442 A.2d 1114 (Pa. Super. Ct. 1982)..............................................................13, 14

*Allegheny Energy, Inc. v. DQE, Inc.*,
  171 F.2d 153 (3d Cir. 1999)................................................................................12

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
  42 F.3d 1421 (3d Cir. 1994)................................................................................27

*Armstrong World Indus., Inc. v. Allibert*,
  No. 97-3914, 1997 WL 793041 (E.D. Pa. Nov. 26, 1997) ......................................24

*B.G. Balmer & Co. v. Frank Crystal & Co., Inc.*,
  148 A.3d 454 (Pa. Super. Ct. 2016)......................................................................24

*Bimbo Bakers USA, Inc. v. Botticella*,
  613 F. 3d 102 (3d Cir. 2010)...................................................................... *passim*

*Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*,
  No. 16-2499, 2017 WL 1105648 (E.D. Pa. Mar. 24, 2017) ....................................13

*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F.2d 86 (3d Cir. 1992)............................................................................24, 26

*Capsicum Grp., LLC v. Rosenthal*,
  No. 2:13-CV-05322-WY, 2013 WL 6667822 (E.D. Pa. Dec. 17, 2013)...............................22

*Cerro Fabricated Prods. LLC v. Solanick*,
  300 F. Supp. 3d 632 (M.D. Pa. 2018)......................................................16, 18, 26

*Certainteed Ceilings Corp. v. Aiken*,
  No. 14–3925, 2015 WL 410029 (E.D. Pa. Jan. 29, 2015) ......................................18

*Eagle View Techs., Inc. v. Xactware Sol'ns, Inc.*,
    No. 1:15-cv-07025-RMB, Dkt. 841 (D.N.J. Oct. 18, 2019) ................................25

*Ecolaire Inc. v. Crissman*,
    542 F. Supp. 196 (E.D. Pa. 1982) ........................................................................27

*Elliott v. Kiesewetter*,
    98 F.3d 47 (3d Cir. 1996)......................................................................................28

*Ellsworth Assoc. v. U.S.*,
    917 F. Supp. 841 (D.D.C. 1996)..........................................................................28

*Ent. Tech. Corp. v. Walt Disney Imagineering*,
    No. 03-3546, 2003 WL 22519440 (E.D. Pa. Oct. 2, 2003) ..................................29

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
    730 F.2d 61 (2d Cir. 1984)....................................................................................26

*Fres-co Sys. USA, Inc. v. Hawkins*,
    690 F. App'x. 72 (3d Cir. 2017) ...........................................................................13

*Graphic Mgmt. Assoc., Inc. v. Steckel*,
    No. 86-1047, 1986 WL 9723 (E.D. Pa. Sept. 4, 1986)........................................25

*Harper v. Corizon*,
    No. 14-639, 2015 WL 158798 (E.D. Pa. Jan. 12, 2015).......................................11

*Hess v. Gebhard & Co.*,
    808 A.2d 912 (Pa. 2002) ......................................................................................23

*Highmark, Inc. v. UP MC Health Plan, Inc.*,
    276 F .3d 160, 173 (3d Cir. 2001).........................................................................12

*Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*,
    630 F. Supp. 2d 527 (E.D. Pa. June 15, 2009)......................................................18

*HR Staffing Consultants LLC v. Butts*,
    627 F. App'x 168 (3d Cir. 2015) ..........................................................................27

*Insulation Corp. of Am. v. Brobston*,
    667 A.2d 729 (Pa. Super. Ct. 1995)......................................................................22

*Jazz Pharms., Inc. v. Synchrony Grp., LLC*,
    343 F. Supp. 3d 434 (E.D. Pa. 2018)....................................................................13

*Liberty Fencing Club LLC v. Fernandez-Prada*,
    No. 17-0180, 2017 WL 3008758 (E.D. Pa. July 14, 2017) ..................................21

*Lux Global Label Co., LLC v. Shacklett*,
   No. 18-5061, 2019 WL 3530424 (E.D. Pa. July 31, 2019) ....................................................20

*Marxe v. Jackson*,
   833 F.2d 1121 (3d Cir. 1987)....................................................................................................11

*Matthews Int'l Corp. v. Lombardi*,
   No. 20-89, 2021 WL 732722 (W.D. Pa. Feb. 25, 2021)....................................................23, 24

*Moore v. Kulicke & Soffa Indus., Inc.*,
   318 F. 3d 561 (3d Cir. 2003)....................................................................................................13

*Mountain Prods., Inc. v. Piccola*,
   No. 3:22-CV-01588, 2022 WL 17242872 (M.D. Pa. Nov. 23, 2022) ..............................12, 24

*Nat'l Bus. Servs. v. Wright*,
   2 F. Supp. 2d 701 (E.D. Pa. 1998) ....................................................................................27, 28

*Nat'l Reprographics, Inc. v. Strom*,
   621 F. Supp. 2d 204 (D.N.J. 2009) ..........................................................................................21

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*,
   69 F. App'x 550 (3d Cir. 2003) ................................................................................................26

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*
   *Co.*,
   290 F.3d 578 (3d Cir. 2002)......................................................................................................25

*Opticians Assoc. of Am. v. Indep. Opticians of Am.*,
   920 F.2d 187 (3d Cir. 1990)......................................................................................................26

*Orthovita, Inc. v. Erbe*,
   No. 07-2395, 2008 WL 423446 (E.D. Pa. Feb. 14, 2008) ........................................................21

*Pappan Enter. v. Hardee's Food Sys.*,
   143 F.3d 800 (3d Cir. 1998)......................................................................................................26

*Penn-Air & Hydraulics Corp. v. Lutz*,
   No. 15-1422, 2015 WL 4508922 (M.D. Pa. July 24, 2015) ....................................................25

*PetroChoice Holdings, Inc. v. Orobono*,
   No. 19-6152, 2022 WL 138008 (E.D. Pa. Jan. 14, 2022)........................................................19

*Phila. Newsp., Inc. v. Gannett Satellite Info. Network, Inc.*,
   No. 08-2782, 1998 WL 404820 (E.D. Pa. July 15, 1998) ......................................................28

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017)......................................................................................................11

*Rita's Water Ice Franchise Co. v. S.A. Smith Enters.*,
    No. 10-4297, 2011 WL 101694 (E.D. Pa. Jan. 11, 2011)........................................................22

*Rohm & Haas Co. v. Lin*,
    992 A.2d 132 (Pa. Super. Ct. 2010).........................................................................................16

*Saudi Basic Indus. Corp. v. Exxon Corp.*,
    364 F.3d 106 (3d Cir. 2004).....................................................................................................12

*Synthes, Inc. v. Emerge Med., Inc.*,
    25 F. Supp. 3d 617 (E.D. Pa. 2014).........................................................................................16

*Tantopia Franchising Co., LLC v. W. Coast Tans of PA, LLC*,
    918 F. Supp. 2d 407 (E.D. Pa. 2013).......................................................................................27

*Telechron, Inc. v. Telicon Corp.*,
    198 F.2d 903 (3d Cir. 1952).....................................................................................................26

*Teva Pharm. USA, Inc. v. Sandhu*,
    291 F. Supp. 3d 659 (E.D. Pa. 2018).................................................................................12, 18

*TKR Cable Co. v. Cable City Corp.*,
    267 F.3d 196 (3d Cir. 2001).....................................................................................................28

*Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*,
    655 F. Supp. 2d 581 (W.D. Pa. 2009).....................................................................................11

*Volunteer Fireman's Ins. Servs., Inc. v. Cigna Prop. & Cas. Ins. Agency*,
    693 A.2d 1330 (Pa. Super. Ct. 1997).......................................................................................22

*Wincup Holdings, Inc. v. Hernandez*,
    No. 04-1330, 2004 WL 953400 (E.D. Pa. May 3, 2004)..........................................................22

*Wurth Baer Supply Co. v. Strouse*,
    No. 21-1913, 2022 WL 4125082 ......................................................................................20, 23

*Zambelli Fireworks Mfg. Co. v. Wood*,
    592 F.3d 412 (3d Cir. 2010).....................................................................................................24

**Statutes**

12 Pa. C.S. § 5302.........................................................................................................................12

18 U.S.C.
    § 1836.......................................................................................................................................13
    § 1839................................................................................................................................12, 13

**Rules**

Fed. R. Civ. P.
    26(d)..........................................................................................................................28
    65(c) ...............................................................................................................1, 11, 28

## I.   INTRODUCTION

Plaintiff Unisys Corporation ("Unisys") respectfully requests that the Court grant a temporary restraining order under Rule 65(b) of the Federal Rules of Civil procedure enjoining (1) Defendants Leon Gilbert ("Gilbert") and Michael McGarvey ("McGarvey") (together, "Defendants") from disclosing, retaining, or using any confidential or trade secret information of Unisys; (2) Defendants from working at Atos SE ("Atos") in the field of digital workplace services, and each of its affiliates, or another competitor of Unisys; and (3) Gilbert from soliciting any employee at Unisys to leave his or her employment at Unisys.  Unisys also respectfully requests that the Court permit Unisys to take expedited discovery as set forth herein, and set a hearing and briefing schedule on Unisys' forthcoming motion for a preliminary injunction to occur prior to expiration of the temporary restraining order.

This case involves the theft of huge quantities of Unisys trade secrets, which reflect substantial investments in industry-leading innovations by Unisys.  In a plot orchestrated with Atos, Defendants abruptly announced that they were leaving Unisys to work at competitor Atos during the second week in January 2023.  But, shortly before filing this suit, Unisys discovered that Defendants were not merely changing jobs.  Rather, between them, they were leaving Unisys with thousands of Unisys' trade secret documents and planned to use Unisys' trade secrets and confidential information at Atos to directly compete with Unisys.

For approximately two years, Defendants led Unisys' digital workplace solutions ("DWS") business unit.  In those roles, Defendants gained extensive familiarity with Unisys' trade secrets relating to DWS and had access to Unisys' proprietary and confidential documents.  Defendants worked at Unisys during a time of transformation for Unisys' DWS business, with Unisys remaking its platform into a proactive experience that provides insight into how to increase

1

productivity gains in a client's associate base.  Unisys invested hundreds of millions of dollars to do so, on top of the substantial investment it had already made developing its DWS solutions over many years.  Clients took notice of this change, and Unisys successfully obtained many market wins as a result.

Atos's story is very different.  While Atos has its own DWS business unit, beginning in at least 2020, Atos shifted its focus elsewhere.  Unsurprisingly, as Atos operated in maintain mode, its DWS prospects began to dwindle, and the company acknowledged that it would require an "ambitious turnaround" to salvage.  After Atos's initial plans for a turnaround failed, Defendants found another way to effectuate a "turnaround":  they conspired to steal Unisys trade secrets to build a competing business at Atos.

McGarvey accessed Atos internal websites, which require usernames and passwords for access, in late October and November 2022.  In early November 2022, Gilbert sent a confidential Unisys client communication to an Atos employee.  According to Gilbert, Atos's CEO Nourdine Bihmane subsequently reached out and asked him to come to Atos to run its DWS business.  Among other things, Gilbert was clear that he wanted McGarvey to come with him to Atos.  There is no doubt about why:  McGarvey surreptitiously mass downloaded to his personal laptop over *13,000* confidential technical and business strategy documents related to Unisys' proprietary and confidential DWS technologies, business strategies and customers before announcing he was leaving Unisys to join Atos.  Once that theft was complete, Gilbert confirmed the plan, telling an Atos senior vice president that he "spent [the] last 2 years in the model Atos is trying to get into, so know what works and doesn't.  Have to now show [Atos's CEO] the sam*e*."

Defendants also took steps to evade discovery of the misappropriation, with Gilbert appearing to wipe his browser history in early January 2023, McGarvey denying that he

downloaded any Unisys documents to his laptop during an exit interview from Unisys, and McGarvey failing to respond to Unisys' requests that he submit his personal computer for examination. All of this is further compounded by Gilbert's attempts to poach additional Unisys employees, in direct breach of non-solicitation restrictions in his compensation agreements.

Unisys' likelihood of success is undisputable: Unisys' trade secrets took years to develop and are critical to the company's success. Thousands of those trade secrets were misappropriated to allow Atos to compete unfairly with Unisys. As such, Unisys has and will suffer significant irreparable harm, and immediate injunctive relief is therefore required. Such irreparable harm to Unisys cannot readily be quantified: Unisys will likely lose customers and market share; more employees; its advantage in the marketplace; and will likely suffer harm to its reputation as an innovator if Defendants are not immediately stopped from continuing to possess and use Unisys' trade secrets to develop, improve, and sell competing solutions at Atos. These are harms that cannot be adequately remedied through past damages. Accordingly, Unisys respectfully submits that entry of a temporary restraining order ("TRO") immediately stopping Defendants from any further disclosure, possession, or use of Unisys' confidential information and trade secrets is necessary and appropriate to stop more irreparable harm from occurring while the parties conduct expedited discovery on these issues and brief and appear before the Court for a hearing on Unisys' forthcoming motion for a preliminary injunction.

## II.    FACTUAL BACKGROUND

### A.    Unisys and its DWS Business Unit

Unisys is an industry leader in global information technology solutions. Since its founding in 1873 (when Unisys sold the first commercially viable typewriter), Unisys has propelled people and organizations forward. Exs. 26, 27. Unisys continues to provide solutions that help organizations succeed. One category of Unisys' offerings is DWS, which allows customers to

provide their workforce with the tools, solutions, and services that their employees need to work securely and effectively.   Ex. 6.   As part of that product, Unisys is empowering the hybrid workplace and workforce by designing smarter, innovative workplaces that create seamless, digital experiences securely.  *Id.*  Its reliable and high-quality product offerings are the result of significant investment of time and resources, and it invests heavily to support its engineering and business teams' creation of industry leading technologies and products.  Thomson Decl. ¶ 7.  Unisys relies on its trade secrets to guard the intellectual property created by the ingenuity and industry of its employees.  *Id.*

By 2020, Unisys was seeking to transform its DWS business unit to focus on higher growth and higher margin user experienced-based solutions.  Thomson Decl. ¶ 5.  To do so, Unisys spent hundreds of millions of dollars developing its industry-leading technologies and business strategies and acquiring companies that provided critical technologies for DWS.  *Id.* ¶¶ 5-6.  And Unisys hired Gilbert and McGarvey to lead Unisys' DWS business unit through this transformation, with full support of the company.  *Id.* ¶¶ 34, 35.  Gilbert served as Unisys' Senior Vice President and General Manager, DWS, from February 1, 2021, until his resignation on January 27, 2023.  Davis Decl. ¶ 4.  McGarvey served as Unisys' Vice President of Solutions Management from March 15, 2021 until February 5, 2023.  *Id.*

**B.      Defendants' Work at Unisys and Their Confidentiality and Non-Solicitation Obligations**

McGarvey worked side-by-side with Gilbert to run the DWS business unit.  During their employment at Unisys, Unisys trusted Gilbert and McGarvey—who both signed agreements confirming the confidential nature of their work—with Unisys' confidential information on highly sensitive and proprietary technologies and products.  Thomson Decl. ¶¶ 10-11, 15-16, 20-21, 25-26, 30-31.  Specifically, Gilbert and McGarvey were informed of Unisys' confidentiality policies

when they were hired, and signed Employee Proprietary Information, Invention and Non-Competition Agreements ("Employee Proprietary Agreement").   Davis Decl. ¶ 7.   Those agreements provide:

- The employee "will not direct or indirectly during or after the term of [his] employment . . . transfer, or allow to be transferred, any information that is not generally known outside the Company or that is designated by the Company as 'Confidential' or 'Restricted Confidential' or is similarly designated, to any person, firm or organization not authorized by the Company to receive it, or to use any of such designated information other than for the sole benefit of the Company[.]" Ex. 8 ¶ 1(d); Ex. 9 ¶ 1(d).

- The employee "will keep [him]self informed of the Company's policies and procedures for safeguarding Company-controlled property, including all proprietary data and information and will strictly comply therewith at all times. . . . [The employee] will return to the Company, immediately upon termination of my employment or upon my transfer within the Company, all Company-controlled property in my possession or control.   [The employee] further warrant[s] that [he] shall not, as a consequence of [his] employment at Unisys, breach any duty not to disclose or otherwise utilize for the benefit of the Company any 'proprietary,' 'confidential,' 'limited,' 'private' or other information of a similar type of nature from any prior employer or entity that I remain obligated to hold in confidence." Ex. 8 ¶ 2; Ex. 9 ¶ 2.

They also signed Compensation Agreements,[1] which required them to reaffirm their commitment to the Employee Proprietary Agreement and to keep Unisys information confidential.   The Compensation Agreements also include time-limited non-solicitation provisions:

10.1   Except as illegal or unenforceable under applicable law, during employment and for twelve months after leaving Unisys, Grantee will not: (a) directly or indirectly solicit or attempt to influence any employee of Unisys to terminate his or her employment with Unisys, except as directed by Unisys; (b) directly or indirectly solicit or divert to any competing business any customer or prospective customer to which Grantee was assigned at any time during the eighteen months prior to leaving Unisys; or (c) perform services for any Unisys customer or prospective

---

[1]   Section 10 in Exhibits 10 (Gilbert 2021 Performance RSU Grant Agreement), 11 (Gilbert  2021 Profit-Based Cash Grant Agreement); section 11 in Exhibits 12 (Gilbert 2021 Retention Performance RSU Grant Agreement), 13 (Gilbert 2021 Retention RSU Grant Agreement); section 10 in Exhibits 14 (Gilbert 2021 RSU Grant Agreement), 15 (Gilbert 2022 Performance RSU Grant Agreement), 16 (Gilbert 2022 Profit-Based Cash Grant Agreement), 17 (Gilbert 2022 RSU Grant Agreement), 18 (McGarvey Performance RSU Grant Agreement), 19 (McGarvey Profit-Based Cash Grant Agreement), 20 (McGarvey RSU Grant Agreement).  These exhibits are collectively referred to as the "Compensation Agreements."

customer, of the type Grantee provided while employed by Unisys for any Unisys customer or prospective customer for which Grantee worked at any time during the eighteen months prior to leaving Unisys.

Exs. 10-11 § 10.1; Exs. 12-13 § 11.1; Exs. 14-20 § 10.1.

Gilbert and McGarvey had access to Unisys' trade secrets (such as proprietary digital workplace solutions and technical and business strategy information) due to their roles leading the DWS business unit.  Thomson Decl. ¶¶ 11-12, 16-17, 21-22, 26-27, 31-32.  They were privy to Unisys' proprietary technical documents, design ideas, business strategies, customer lists and strategies, pricing, product planning, cost management, design guidelines, and research and development efforts.  *Id.* ¶¶ 12, 17, 22, 27, 32.  Gilbert and McGarvey were also involved in confidential work developing and implementing the strategy for the DWS unit itself, which included discussions at the executive level.  *Id.* ¶¶ 35-36.  In other words, Gilbert and McGarvey were not only aware of Unisys' confidential DWS playbook, but they were also intimately involved in its creation.  *Id.*

**C.      The Theft**

Despite the significant company resources dedicated to Gilbert's and McGarvey's work for DWS, in early January 2023, Gilbert and McGarvey announced they were leaving Unisys to work for Atos in a competing business unit.  But they were not leaving empty-handed.  Rather, they moved forward with a plan to, between them, steal thousands of documents containing Unisys confidential information and trade secrets to use at Atos to develop and improve Atos's competing business.

Like Unisys, Atos offers DWS products and services, and Unisys and Atos often compete to serve the same customers.  Thomson Decl. ¶ 40.  Atos, however, differs from Unisys in its commitment to research and development ("R&D") and advancement its DWS business.  In or around 2020, Atos switched its focus to cloud computing, and stopped investing in the growth of

its DWS business.  Ex. 4.  In 2021, Atos saw a drop in revenue (even though IT services were growing), and it blamed that decline on classic IT business, which encompasses digital workplaces.  Ex. 23; *see also* Ex. 5.  At the beginning of 2022, Atos recognized that its digital workplace division would need to be the subject of an "ambitious turnaround."  Ex. 23.

Atos's initial plan for the turnaround failed, so in late October 2022, Defendants began working on plan B: taking Unisys' confidential information and trade secrets to Atos.[2]  In late October/November 2022, McGarvey visited Atos internal websites, like Atos's SharePoint site and Atos's employee rewards sites, which require usernames and passwords to access.  Marshall Decl. ¶¶ 17-18.  Gilbert forwarded a confidential communication between Unisys and one of its customers to an Atos employee on November 1, 2022.  Ex. 1.  Then, in December 2022, Gilbert put the wheels in motion to rejoin Atos at the behest of Atos's CEO, and to take a team from Unisys with him.  Ex. 7 at 3.  On December 26, 2022, Gilbert drafted an email to Atos's human resources leader that listed McGarvey and other Unisys employees that he wanted to take with him.  Ex. 2.  He also included their Unisys compensation and the value that they would add to Atos.  *Id.*  For example, Gilbert stated that another Unisys employee would "[w]ould almost guarantee a long-term renewal" of a customer contract at Atos.  *Id.*

On January 4-5, 2023, the plan went into high gear:  McGarvey downloaded approximately 13,000 confidential Unisys files to his personal laptop.  Marshall Decl. ¶ 21.  The screenshots below show examples of the confidential documents Mr. McGarvey downloaded to his laptop.

---

[2]    A critical change also occurred at Atos in July 2022: Nourdine Bihmane ascended to CEO at Atos.  Mr. Bihmane and Gilbert have a close relationship, and were in close communication regarding Gilbert's move to Atos.

There was no legitimate, job-related purpose for McGarvey to download this large quantity of documents to his personal computer. Nor was it typical for McGarvey to download such large numbers of documents as part of his job responsibilities at Unisys. For example, in the month prior, McGarvey would typically access between 40-150 SharePoint documents per day, a fraction of what he downloaded in a single sitting on January 4-5. Marshall Decl. ¶ 21. Moreover, McGarvey had apparently already been hired by Atos; forensic evidence indicates he signed an agreement with Atos on January 5. Marshall Decl. ¶ 19. And, in an apparent attempt to evade detection, McGarvey engaged in his mass downloads *before* announcing his departure from Unisys.

Gilbert likewise showed his disregard for the confidentiality and non-solicitation agreements he signed with Unisys. On January 11, 2023, after announcing his resignation and attending a leadership meeting, Gilbert sent a WhatsApp message to a member of Unisys' senior leadership team that "[y]ou know I will take you" "[a]ssuming you want to," despite non-solicitation provisions prohibiting this very conduct. Exs. 3, 8. The next week, Gilbert deleted many emails and wiped his Chrome browser history. Marshall Decl. ¶ 13.

Once McGarvey had the documents, Gilbert confirmed the plan was a "go" with Atos Senior Vice President Hansjorg Walz on January 19, 2023. Ex. 24. During this conversation, Gilbert outlined his vision for the groups in the DWS division at Atos, and Walz sent Gilbert a proposed structure for the group, which included McGarvey and other employees from Unisys:



*Id.*

Gilbert also stated that he "spent last 2 years in the model Atos is trying to get to, so [he] know[s] what works and doesn't.  Have to now show Nourdine[, Atos's CEO,] the same."  *Id.*  Walz responded with a simple "indeed."  *Id.*  In parallel, Gilbert attempted to cover his tracks, wiping his Chrome browser history shortly before his departure from Unisys.  Marshall Decl. ¶ 13.  And on January 22, 2023, Gilbert accessed his personal Google Drive at least twenty times over a twenty-five-minute period; Unisys does not use Google Drive for any business purposes.  *Id.* ¶ 12.

During their exit interviews, Gilbert and McGarvey told obviously coordinated stories, blaming Unisys leadership for their departures and claiming that Unisys had failed to acquire any companies for them—which was untrue, given that Unisys acquired *two* companies for DWS while it was helmed by Gilbert and McGarvey.  Ex. 7.  They also indicated that they were unhappy with their compensation at Unisys, and that taking positions at Atos would be far more lucrative.  *Id.*  McGarvey also lied about his downloads of Unisys confidential documents.  *Id.*  He was asked

several times during his exit interview whether he had downloaded Unisys documents to his personal laptop and each time replied that he had not, insisting that "there's nothing [at Unisys he] would want." *Id.* McGarvey also failed to respond to Unisys' requests that he provide his personal laptop to Unisys so it could confirm that he had not downloaded company confidential information to his personal laptop. Davis Decl. ¶ 10. Gilbert has yet to return his Unisys-issued laptop, and in response to Unisys' follow up on the issue, he simply promised that he will send it. Davis Decl. ¶ 9.

At Atos, Gilbert runs the global Digital Workplace business and reports to the CEO, which are job responsibilities that are comparable to those that he had at Unisys, and McGarvey again works with Gilbert in DWS and has job responsibilities that are identical to the ones that he had at Unisys. Ex. 7 (Gilbert stating that his job responsibilities will be to "run global Digital Workplace business and report into the CEO" and McGarvey stating that he will "have the opportunity to fulfill what [he] came [to Unisys] to do" and that he will "be CTO of DWS and strategy"). However, Defendants will now have information that is unique and confidential to Unisys—Unisys' entire playbook and business plan for the next several years, along with thousands of trade secret technical and business strategy documents—which will allow Atos to leapfrog Unisys in the market through unfair competition. Gilbert made clear to senior leadership at Atos that he fully intends to use Unisys' confidential playbook in his work at Atos. Ex. 24 (Gilbert stating that he "spent last 2 years in the model Atos is trying to get to, so [he] know what works and [what] doesn't. Have to now show [Atos CEO] the same").

The downloading of Unisys confidential documents prior to leaving, soliciting of employees, and coordinated departures demonstrates concerted activity between the Defendants to steal and use Unisys' trade secrets. Moreover, the harm associated with this illicit activity is

significant and irreparable. Once a customer is won, they typically enter three-to-five-year contracts, which means that once a customer is lost, that loss is felt for years. Thomson Decl. ¶ 40. As a result, Gilbert's and McGarvey's use of Unisys' confidential playbook at Atos will significantly disadvantage Unisys while giving Atos an unfair head start. *Id.* Unisys had no choice but to file this lawsuit and seek immediate injunctive relief to stanch the irreparable harm that will occur from Gilbert's and McGarvey's use of Unisys' trade secrets in their employment at Atos.

## III.   ARGUMENT

"If there is a possibility that irreparable injury will occur before the hearing on a preliminary injunction required by Rule 65(a) can be held, a temporary restraining order may be available under Rule 65(b)." *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 588 (W.D. Pa. 2009). "Courts within this Circuit have noted the similarities between a TRO and a preliminary injunction, and have applied the same standards in determining their application." *Harper v. Corizon*, No. 14-639, 2015 WL 158798, at *3 n.4 (E.D. Pa. Jan. 12, 2015). In exercising its discretion to issue a temporary restraining order pursuant to Federal Rule of Civil Procedure 65, this Court should consider whether the moving party can satisfy four factors: "(1) a likelihood of success on the merits; (2) [whether the movant] will suffer irreparable harm if the injunction is denied; (3) [whether] granting relief will not result in even greater harm to the nonmoving party; and (4) [whether] the public interest favors such relief." *Bimbo Bakers USA, Inc. v. Botticella*, 613 F. 3d 102, 109 (3d Cir. 2010). "[T]he strength of the plaintiff's showing with respect to one [factor] may affect what will suffice with respect to another." *Marxe v. Jackson*, 833 F.2d 1121, 1128 (3d Cir. 1987). Where there is significant imminent harm at stake, an even lesser showing is required for a claim on the merits. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Courts have not hesitated to issue an injunction where, as here, a party's trade secrets are

at stake.  *See, e.g.*, *Mountain Prods., Inc. v. Piccola*, No. 3:22-CV-01588, 2022 WL 17242872, at *20 (M.D. Pa. Nov. 23, 2022).  Here, all four factors weigh strongly in favor of a temporary restraining order.

### A.      Unisys has a high likelihood of succeeding on the merits.

For the court to issue a temporary restraining order or preliminary injunction, the movant need not prove its entire case.  Rather, the movant "need only prove *a prima facie case, not a certainty that he or she will win*."  *Highmark, Inc. v. UP MC Health Plan, Inc.*, 276 F .3d 160, 173 (3d Cir. 2001) (emphasis added).  Thus, the Third Circuit requires only a "reasonable likelihood" of success on the merits.  *Saudi Basic Indus. Corp. v. Exxon Corp.*, 364 F.3d 106, 112 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.2d 153, 158 (3d Cir. 1999)).  For each of Unisys' claims, there is at least a reasonable likelihood of success.

### 1.      Unisys will likely succeed on its trade secret misappropriation claims.

While the Defend Trade Secrets Act ("DTSA") and Pennsylvania Uniform Trade Secrets Act ("PUTSA") use different wording, they essentially define "trade secret" as protecting the same type of information.  *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018). That is, both the DTSA and the PUTSA define "trade secret" as information that:  "(a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use."  *Id.* (citing 18 U.S.C. § 1839(3); 12 Pa. C.S. § 5302).

Under the PUTSA, the elements of a misappropriation of trade secrets claim are:  "'(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff.'"  *Accurso v. Infra-Red Servs., Inc.*, No. 13-7509, 2018 WL 924985, at *7-8 (E.D. Pa.

Feb. 16, 2018) (quoting *Moore v. Kulicke & Soffa Indus., Inc.*, 318 F. 3d 561, 566 (3d Cir. 2003))

"One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other

if … his disclosure or use constitutes a breach of confidence." *Id.*

A claim for misappropriation under the DTSA is available if the trade secret is related to a

product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C.

§ 1836. Under the DTSA, "misappropriation" is defined as "acquisition of a trade secret of another

by a person who knows or has reason to know that the trade secret was acquired by improper

means." *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. 16-2499, 2017

WL 1105648, at *3 (E.D. Pa. Mar. 24, 2017) (quoting 18 U.S.C. § 1839(5)(A)). A

misappropriation also occurs when one "discloses" or "uses" another's trade secret without the

consent of the trade-secret owner. *Id.* (quoting 18 U.S.C. § 1839(5)(B)).

Under both the DTSA and PUTSA, "[a] court may enjoin the actual or threatened

misappropriation of a trade secret." *Botticella*, 613 F.3d at 110. Threatened misappropriation is

sometimes referred to as "inevitable disclosure." *See id.* at 110-11; *Jazz Pharms., Inc. v.*

*Synchrony Grp., LLC*, 343 F. Supp. 3d 434, 446 (E.D. Pa. 2018); *see also Air Prods. & Chems.,*

*Inc. v. Johnson*, 442 A.2d 1114, 1122 (Pa. Super. Ct. 1982). Under the doctrine of inevitable

disclosure, a "plaintiff may prove a claim of trade secret misappropriation by demonstrating that

defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."

*Botticella*, 613 F.3d at 111. Where there is a substantial overlap (if not exact identity) between an

employee's former work and his intended work (i.e., same role, same industry, same geographic

industry), a court may properly conclude that the employee would likely use her confidential

knowledge to the detriment of the former employer. *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F.

App'x. 72, 76 (3d Cir. 2017) ("Given the substantial overlap (if not identity) between Hawkins's

13

work for Fres-co and his intended work for Transcontinental—same role, same industry, and same geographic region—the District Court was well within its discretion to conclude Hawkins would likely use his confidential knowledge to Fres-co's detriment."). Pennsylvania courts hold that an injunction must be issued where a "defendant's new employment is likely to result in the disclosure of a former employer's trade secrets." *Botticella*, 613 F.3d at 111-12 (emphasis added) (citations omitted); *see also Air Prod. & Chems.*, 442 A.2d at 1120.

If an employee is likely to use confidential information in his new employment, then the former employer is at risk of irreparable harm. *Botticella*, 613 F.3d at 116. "The proper inquiry in determining whether to grant an injunction to prevent the threatened disclosure of trade secrets is not whether a defendant inevitably will disclose a trade secret in the absence of injunctive relief, but instead whether there is sufficient likelihood, or substantial threat, of defendant doing so in the future." *Id.* (citations omitted). The Court recognized that a former employee's access to "long term strategies, operating costs, and customer negotiations" justified an injunction preventing a former employee from working for the defendant. *Id.* at 113-14.

For both the DTSA and the PUTSA, Unisys easily meets the threshold of showing a reasonable likelihood of success of a *prima facie* case.

      a.      <u>Unisys' confidential, proprietary information is entitled to trade secret protection.</u>

Unisys has developed proprietary digital workplace solutions which provide proactive, personalized technology and support services to elevate a customer's digital workplace experience without compromising compliance or security. Thomson Decl. ¶ 4. Unisys has invested a tremendous amount of time and resources into its research and development of its solutions and created many confidential documents during the research and development process. *Id.* ¶ 7.

Further, Unisys has invested significant resources into its confidential and proprietary business strategy information.  *Id.*  For instance, Unisys has accumulated years of confidential and proprietary strategies that are critical to the company's success in the marketplace and plans for the future.  *Id.*  This includes, for example, confidential documents regarding Unisys' cost and pricing strategy, investments, partnerships, product roadmaps and projections, goals and plans for revenue growth and market power, product development, potential acquisition plans, and workforce plans.  *Id.*  Such confidential information represents Unisys' years of experience and investment, including in market research and technology development.  *Id.*

McGarvey downloaded several categories of Unisys trade-secret information.  For example:

- As part of Unisys' mission to innovate for our DWS clients, Unisys plans out extensive forecasts for products and revenue projections.  Thomson Decl. ¶ 9.  The Unisys confidential documents that McGarvey accessed and downloaded include proprietary business strategies that cover plans for growth, product optimization, and improved market recognition over the course of several years.  *Id.*  Additionally, the confidential documents include information related to Unisys' investigation into the market landscape for ███████████████ ████████████████████████████████████  *Id.*

- Unisys built a unified communications platform that optimizes the collaboration experience for its clients ████████████████ ██████████████  *Id.* ¶ 15.  The Unisys confidential documents that McGarvey accessed and downloaded include confidential information related to the architecture design for building this communications platform as well as internal presentations that discuss ████████████████████████ internally.  *Id.* ¶ 16.

- Pricing strategy and customer information are highly valuable and proprietary to Unisys.  *Id.* ¶ 19.  The Unisys confidential documents that McGarvey accessed and downloaded include customer contracts with confidential pricing information, statement of works, customer workshops and oral presentations, and information related to current pursuits.  *Id.*  Additionally, these confidential documents included custom configuration and technical specification details for current customers.  *Id.*

- Unisys develops and creates programs for internal use to foster a collaborative and welcoming work environment.  *Id.* ¶ 24.  The Unisys confidential

documents that McGarvey accessed and downloaded include roadmaps and technical specifications related to a proprietary ███████████████████████ ████████████. *Id.* These documents provide detailed information on the integration process and solution architecture for a program that is unique to Unisys. *Id.*

- To support Unisys' numerous product offerings, Unisys develops and creates full solution documents for its newly created solutions. *Id.* ¶ 29. The Unisys confidential documents that McGarvey accessed and downloaded include presentations, training tools, architecture designs, and sales positioning information for Unisys products. *Id.*

These exemplary confidential materials that Gilbert and McGarvey had access to during their time at Unisys, and have now misappropriated, demonstrate just some of Unisys' substantial and sustained investment in its confidential digital workplace solutions, as well as its confidential business strategies. *Id.* ¶ 36. Underlying these technologies are carefully guarded trade secrets that Unisys has developed over the course of many years, and which together with other Unisys intellectual property, have made Unisys a market leader. *Id.* For these reasons and others, Unisys' digital workplace technologies and the secret design, testing, and implementation of its proprietary features and processes are highly valuable assets. *Id.* ¶¶ 7, 36.

Courts routinely find this type of information to be protectable trade secrets. *See, e.g.,* *Cerro Fabricated Prods. LLC v. Solanick*, 300 F. Supp. 3d 632, 649-51 (M.D. Pa. 2018) (finding that plaintiff has successfully shown the following information constitutes protectable trade secrets for purposes of preliminary injunctive relief:  "Pricing," "Margins," "Internal financial information," the company's "methods and techniques," "Pipeline information," and the company's "internal marketing plans, strategic plans, and business plans"); *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 705-06 (E.D. Pa. 2014) ("Courts have found trade secrets to include certain business and marketing information including . . . an employer's business plans, marketing strategies, . . . and revenues generated."); *Rohm & Haas Co. v. Lin*, 992 A.2d 132, 143 n.4 (Pa. Super. Ct. 2010) ("A trade secret may consist of any formula, pattern, device or compilation of

information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."); *A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 940 (Pa. Super. Ct. 2000) (finding that customer information obtained by an employee that is not readily available or has been generated through expense, time, and effort may qualify as a trade secret).

Unisys undertakes substantial measures to ensure that its highly confidential information remains secret and is not misused, including by restricting access to only certain employees who need such information and through numerous other measures.  Unisys requires employees to acknowledge their understanding of the confidentiality requirements through agreements, which Gilbert and McGarvey signed, and company policy.  *See* Exs. 8-22.  Unisys also employs additional extensive protective measures to safeguard its trade secrets.  For instance, Unisys applies confidentiality labels to its documents and limits access to internal company documents. Marshall Decl. ¶ 4.  As just one example of Unisys' physical security measures, it requires key card access, which only Unisys can grant, to enter its buildings.  *Id.*  Other examples of Unisys' security measures include pre-hire security and background checks, mandated ongoing training on security issues, limiting access to files on a need-to-know basis, and implementation of a system to report and detect suspicious activity.  *Id.*

Further, Unisys takes reasonable steps to maintain the secrecy of the contents of the documents stored on the Unisys SharePoint sites.  The Unisys SharePoint sites store highly sensitive documents that contain confidential information regarding Unisys' proprietary technologies, design ideas, customer lists and strategies, pricing, product planning, cost management, design guidelines, research and development efforts, and other trade secrets.  *Id.* ¶ 6. The Unisys SharePoint sites are not accessible to the public.  *Id.*  All access to the Unisys

SharePoint sites requires providing an authorized user-name and password, and communication between a user's web browser and the Unisys SharePoint Sites is encrypted to prevent eavesdropping and interception.  *Id.*

Moreover, access to any specific portions of the Unisys SharePoint Sites is limited according to the job responsibilities of each individual user.  *Id.* ¶¶ 4, 6. That is, the documents stored on the Unisys SharePoint sites are not generally available to all Unisys employees and employees must be expressly and individually granted access to specific portions of the Unisys SharePoint Sites.  *Id.* ¶¶ 4, 6.

The combination of these measures readily satisfies the DTSA and PUTSA requirements for protecting trade secrets.  *See, e.g.*, *Teva Pharm.*, 291 F. Supp. 3d at 666-67 (determining that because the confidential information and trade secrets were classified as confidential and Teva took measures to restrict access to the information, Teva took reasonable measures to maintain its secrecy and the information was not available outside of its company); *Cerro Fabricated*, 300 F. Supp. 3d at 650 (finding plaintiff took reasonable methods to guard the secrecy of its purported confidential information and trade secrets, despite the fact that those efforts "were not extensive").

        b.    <u>Defendants have actually misappropriated Unisys' trade secrets and, regardless, their disclosure is inevitable in Defendants' new positions.</u>

Gilbert and McGarvey had a duty to maintain Unisys' trade-secret information in confidence.  *See* Exs. 8-20; *Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*, 630 F. Supp. 2d 527, 542-43 (E.D. Pa. June 15, 2009) (defendant breaching Confidentiality Agreements and acquiring and using trade secrets through improper means by breaching defendant's duty to maintain the secrecy of the information without plaintiff's express or implied consent would be misappropriation under the PUTSA).  They breached that duty by actual and threatened misappropriation of Unisys' trade secrets, as explained below.  *See Certainteed Ceilings Corp. v.*

*Aiken*, No. 14–3925, 2015 WL 410029, at \*5 (E.D. Pa. Jan. 29, 2015) (claim for actual misappropriation was stated for defendant who breached duty of confidentiality); *Botticella*, 613 F.3d at 110.

At a minimum, Unisys' trade secrets were misappropriated through unlawful acquisition. Under the PUTSA and the DTSA, misappropriation of trade secrets includes the acquisition of a trade secret of another by a person who knows or has reason to know the trade secret was acquired by improper means. *PetroChoice Holdings, Inc. v. Orobono*, No. 19-6152, 2022 WL 138008, at \*4 (E.D. Pa. Jan. 14, 2022). As explained above in Section II.C., *supra*, after Gilbert hand-picked McGarvey to join him at Atos, McGarvey downloaded thousands of documents that contained confidential, proprietary information relating to Unisys' technical, marketing, sales, business, and other documents related to DWS offerings to bring with them to Atos. *See supra* Section II.C. These highly confidential materials describe Unisys' trade secrets as explained in Section III.A.1.a, *supra*. And Gilbert made clear to Atos that he will use Unisys' trade secrets in his new role there:

| LG | **Gilbert, Leon [Leon.Gilbert@unisys.com]**<br>I spent last 2 years in the model Atos is trying to get to, so know what works and doesn't. Have to now show Nourdine the same | 5:30 AM |
| HW | **Hansjörg Walz [hansjoerg.walz@atos.net]**<br>indeed | 5:36 AM |

Ex. 24.

Defendants also attempted to obscure the misappropriation. For example, McGarvey engaged in the mass downloading before informing Unisys that he was resigning. Marshall Decl. ¶ 21. He also deleted several thousand documents of the documents he downloaded from Unisys' system. Marshall Decl. ¶ 25. When directly asked whether he had downloaded any Unisys materials to his personal laptop in his exit interview, he denied doing so multiple times. Ex. 7. And, McGarvey has not responded to Unisys' requests that he provide his personal laptop for

inspection, so that Unisys can ensure that any Unisys confidential information has been removed. Davis Decl. ¶ 12.   Likewise, shortly before his departure, Gilbert wiped his Chrome browser history and accessed his personal Google Drive (which Unisys does not use for any business purpose) at least twenty times over a twenty-five-minute period.  Marshall Decl. ¶¶ 12-13.  Gilbert has also delayed in returning his company-issued laptop.  Davis Decl. ¶ 9.

This conduct is more than sufficient to establish a high likelihood of success on the merits with respect to actual misappropriation.  *See Lux Global Label Co., LLC v. Shacklett*, No. 18-5061, 2019 WL 3530424, at *5 (E.D. Pa. July 31, 2019) (sufficient factual allegations to establish misappropriation were found where defendant downloaded confidential information onto a thumb drive days before resigning and allegedly attempted to delete the same records he took); *Wurth Baer Supply Co. v. Strouse*, No. 21-1913, 2022 WL 4125082, at *1-*3"(M.D. Pa. Sept. 9, 2022) (trade secret misappropriation claim survived motion to dismiss claim based on allegations that defendants mass downloaded confidential information and attempted to obfuscate such activities).

The doctrine of inevitable disclosure provides an additional, independent basis to enjoin Defendants.  As described above, Gilbert and McGarvey are leaving Unisys for comparable roles in a competing business at Atos.  *See supra* Section II.B.  They have detailed knowledge of Unisys' product roadmaps over the next several years, and they will use that confidential and proprietary Unisys information to differentiate Atos from Unisys.  *See supra* Section II.B.  They know Unisys' approach to customers in DWS, strategies Unisys employed to win business in DWS, and how DWS employees were trained—because they designed the approach, the strategies, and the training.  Thomson Decl. ¶ 36.  And confirming the problem that this aspect of trade secret law is designed to avoid, Gilbert candidly told Atos he was going to use this information in his role at Atos.  Ex. 24.

This direct evidence of planned disclosure of Unisys' trade secrets is more than sufficient to show a high likelihood of success on a claim of inevitable disclosure of Unisys' trade secrets. *See Orthovita, Inc. v. Erbe*, No. 07-2395, 2008 WL 423446, at *3, *10 (E.D. Pa. Feb. 14, 2008) (holding that plaintiff's claim for inevitable disclosure survived a motion to dismiss where defendant allegedly copied plaintiff's files, tried to hide this copying of files, and delayed returning his laptop upon termination with plaintiff, and provided confidential information and trade secrets to potential investors who were associated with plaintiff's direct competitors, since a former employer is entitled to enjoin even anticipated employment or business activity that would result in inevitable disclosure to protect the former employer's confidential and proprietary information from disclosure); *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 229 (D.N.J. 2009) (potential disclosure is inevitable even when Defendant did not obtain any underlying documents containing trade secrets: "[g]iven FLMR's stature as a direct competitor and Strom's significant involvement and participation in NRI's strategic business decisions, as well as his knowledge of NRI's strategies for its New Jersey branches").

### 2. Unisys will likely succeed on its breach of contract claims.

Under Pennsylvania law,[3] to prevail on a claim for breach of contract, a plaintiff must prove: "(1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and[ ] (3) resultant damages." *Liberty Fencing Club LLC v. Fernandez-Prada*, No. 17-0180, 2017 WL 3008758, at *7 (E.D. Pa. July 14, 2017). In Pennsylvania, a restrictive covenant, like a non-solicitation or confidentiality agreement, is enforceable when it is (1) ancillary to an employment relationship between the parties to the covenant; (2) supported by adequate consideration; (3)

---

[3]   As previously discussed, Gilbert and McGarvey entered into employment agreements with Unisys, which are governed by Pennsylvania law.  *See* Exs. 10-20 § 20.

reasonably limited in duration and geographic scope; and (4) reasonably necessary to protect the employer's interests. *Volunteer Fireman's Ins. Servs., Inc. v. Cigna Prop. & Cas. Ins. Agency*, 693 A.2d 1330, 1337 (Pa. Super. Ct. 1997); *accord Wincup Holdings, Inc. v. Hernandez*, No. 04-1330, 2004 WL 953400, at *2 (E.D. Pa. May 3, 2004).

Here, Gilbert's and McGarvey's contractual obligations in their Compensation and Employee Proprietary Agreements not to disclose Unisys confidential information or solicit employees to leave Unisys satisfies all four requirements and is therefore enforceable. *See* Exs. 10-20 § 10. First, the non-solicitation and confidentiality provisions in these agreements are clearly ancillary to Defendants' employment, as they were executed as part of their hiring and the compensation package relating to the very jobs they left for Atos. Second, the agreements were supported by consideration, *i.e.,* the Employee Proprietary Agreements were "in consideration" of their employment and the Compensation Agreements provided Defendants stock options and cash grants. *Insulation Corp. of Am. v. Brobston*, 667 A.2d 729, 733 (Pa. Super. Ct. 1995) (for a restrictive covenant entered into subsequent to the commencement of the employee's service, "it must be supported by new consideration, which can be in the form of a corresponding benefit or a beneficial change in employment status"). Third, it is reasonable for employees to be required not to disclose their employer's confidential information, and the one-year temporal restriction regarding non-solicitation is reasonable. *See, e.g., Capsicum Grp., LLC v. Rosenthal*, No. 2:13-CV-05322-WY, 2013 WL 6667822, at *9 (E.D. Pa. Dec. 17, 2013) (enforcing two-year covenant); *Rita's Water Ice Franchise Co. v. S.A. Smith Enters.*, No. 10-4297, 2011 WL 101694, at *7 (E.D. Pa. Jan. 11, 2011) (enforcing two-year covenant). Finally, confidentiality requirements and the one-year temporal restriction for non-solicitation protects Unisys' legitimate business interests in

protecting "trade secrets, confidential information, good will, and unique or extraordinary skills." *Hess v. Gebhard & Co.*, 808 A.2d 912, 920 (Pa. 2002).

Despite the clear terms and enforceability of the Employee Proprietary and Compensation Agreements, Defendants breached them. As explained in Section III.A.1, *supra*, Defendants misappropriated Unisys' trade secrets, which is a breach of the confidentiality requirements in these agreements. *Wurth Baer*, 2022 WL 4125082, at *9 (employees "breached the confidentiality agreements when they downloaded (and then deleted) Hermance's customer data and other confidential information without authority and for the purpose of establishing a competing business").

Gilbert also violated the non-solicitation provisions. For example, on January 11, 2023, after announcing his resignation and attending a leadership meeting, Gilbert sent a WhatsApp message to a member of Unisys' senior leadership team that "[y]ou know I will take you" "[a]ssuming you want to," despite non-solicitation provisions prohibiting this very conduct. Ex. 3. That alone is a material breach of the non-solicitation provision sufficient to grant a TRO. *Matthews Int'l Corp. v. Lombardi*, No. 20-89, 2021 WL 732722, at *14 (W.D. Pa. Feb. 25, 2021) (granting preliminary injunction when a former employee breached the non-solicitation provision of the employment agreement by soliciting a coworker to join a competitor).

Gilbert also made clear in his exit interview that more departures from Unisys were likely. Ex. 7 (responding when asked who else was at risk that "[a] lot of people" were). Gilbert also drafted an email to Atos's human resources lead with confidential salary details about McGarvey and two other Unisys employees, emphasizing that he wanted to bring all three with him to Atos (he was successful in bringing two). Ex. 2. Gilbert's campaign to poach Unisys' employees has and will harm Unisys significantly, and the restrictive covenant is reasonably necessary to protect

against a large swath of employees taking Unisys' trade secrets, specialized training, and good will

to a competitor.  *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 424 (3d Cir. 2010)

(concluding a business had a legitimate business interest in a restrictive covenant because of

employee's interactions with clients during employment (and potential to use that good will at a

competitor), familiarity with confidential business information, and the specialized training the

employee received).  This is more than sufficient to establish a high likelihood of success on this

claim.  *See Matthews*, 2021 WL 732722, at *14; *B.G. Balmer & Co. v. Frank Crystal & Co., Inc.*,

148 A.3d 454, 465 (Pa. Super. Ct. 2016) (breach of proprietary agreement when (1) defendant

provided competing company with list of employees he wanted to join him at competitor and those

employees met with competitor and received offers in violation of non-solicitation clause and (2)

defendant provided competitor trade secrets, such as confidential client information).

## B. Defendants' misappropriation and breach of contract will irreparably harm Unisys.

The disclosure or improper use of trade secrets and/or confidential information is a

hallmark of irreparable harm.  *See, e.g.*, *Mountain Prods.*, 2022 WL 17242872, at *20-*21; *see

also Armstrong World Indus., Inc. v. Allibert*, No. 97-3914, 1997 WL 793041, at *17 (E.D. Pa.

Nov. 26, 1997) ("Courts have found irreparable harm in cases in which the plaintiff … was likely

to misuse the plaintiff's trade secrets or confidential information.").  Courts have also made clear

that the potential disclosure or misuse of an employer's trade secrets and confidential information

alone can establish the irreparable harm element in the injunction analysis.  *See Campbell Soup

Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992).  As the Third Circuit has explained, the

potential disclosure of a misappropriated trade secret will "almost certainly show immediate

irreparable harm …"  *Id.* at 92-93.  Indeed, Defendants' agreements recognize that violation of

their confidentiality and non-solicitation provisions will result in irreparable harm to Unisys.  Exs. 8-9 § 8; Exs. 10-20 § 10.

Here, that irreparable harm is particularly acute.  ***First***, Gilbert and McGarvey's use of Unisys' confidential playbook, along with confidential technical and customer information, at Atos is likely to cause Unisys to lose unrecoverable market share and customers, which cannot be remedied by a money judgment.  Thomson Decl. ¶ 40; *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (finding that loss of market share is irreparable harm); *Eagle View Techs., Inc. v. Xactware Sol'ns, Inc.*, No. 1:15-cv-07025-RMB, Dkt. 841 at 18, 25 (D.N.J. Oct. 18, 2019) (loss of market share relevant to showing irreparable harm).   In the market for DWS service, customers enter into years-long contracts and thus, a single lost customer means lost revenues for years.  Thomson Decl. ¶ 40; *Penn-Air & Hydraulics Corp. v. Lutz*, No. 15-1422, 2015 WL 4508922, at *4 (M.D. Pa. July 24, 2015) (granting TRO because encroachment on plaintiff's client base and competitive position is irreparable harm).  Thus, Gilbert and McGarvey's theft threatens long-lasting and irreparable impact on Unisys' customer base and sales.

***Second***, because Gilbert and McGarvey's misappropriation will allow Atos to avoid the time and costs of developing its own products and solutions, it will obtain a head start that will cause Unisys to lose customers and market share, which cannot be remedied by a monetary judgment.  Thomson Decl. ¶ 40; *Graphic Mgmt. Assoc., Inc. v. Steckel*, No. 86-1047, 1986 WL 9723, at *8 (E.D. Pa. Sept. 4, 1986) (enjoining employee from working for competitor to protect plaintiff's head start time).

***Finally***, if not enjoined, Gilbert and McGarvey will have continued access to and use of Unisys' trade secrets at Atos.  Unisys' inability to control the use of its confidential and

proprietary technology is a significant harm, particularly because it gives Defendants the opportunity to use that technology at Atos, which will harm Unisys' reputation as an innovator and limit its ability to control access to and use of its confidential information.  Thomson Decl. ¶ 40; *Cerro Fabricated*, 300 F. Supp. 3d at 654 ("[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." (quoting *Campbell Soup*, 977 F.2d at 92-93)); *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 555 (3d Cir. 2003) (holding that loss of trade secrets was an irreparable harm that could not be measured in money because "a trade secret once lost is, of course, lost forever" (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)).

### C.    The balance of harm weighs decidedly in favor of entering a temporary restraining order.

As set forth above, Unisys faces immediate and irreparable harm on multiple levels absent injunctive relief.  By contrast, any harm caused to Defendants is either not legally cognizable harm or would be minimal.  To be clear, Unisys is not seeking to preclude Gilbert and McGarvey from lawful employment.   Rather, Unisys is only seeking to prevent Gilbert and McGarvey from misappropriating its trade secrets or taking its valuable employees.  For example, Gilbert and McGarvey can work at employers other than Atos or in Atos business divisions other than DWS, provided, of course, that they do not engage in misappropriation there, either.  *See, e.g.*, *Opticians Assoc. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (finding balance of harm favoring plaintiff because defendants "brought [any] difficulties occasioned by the issuance of an injunction upon [themselves]."); *Pappan Enter. v. Hardee's Food Sys.*, 143 F.3d 800, 806 (3d Cir. 1998) ("The self-inflicted nature of any harm suffered by [the wrongdoer] weighs heavily in favor of granting preliminary injunctive relief."); *Telechron, Inc. v. Telicon Corp.*, 198 F.2d

903, 908 (3d Cir. 1952); (finding balance of harms favoring injunctive relief because defendants took a deliberate risk and were "not in position to urge … blamelessness as a consideration which should be persuasive to a court of equity"); *Nat'l Bus. Servs. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (balance of harms favored employer where employee could earn a livelihood if the injunction issued); *see also Botticella*, 613 F.3d at 118-19 ("[A] temporary restriction on . . . employment is warranted where, as here, the facts demonstrate that the restriction is necessary to prevent greater irreparable harm from befalling another party."); *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 174 (3d Cir. 2015) (concluding that in the case of a willful breach, the equities tipped in favor of the former employer); *accord Tantopia Franchising Co., LLC v. W. Coast Tans of PA, LLC*, 918 F. Supp. 2d 407, 420 (E.D. Pa. 2013) ("In balancing the hardships to the parties, any injury defendants might suffer as a result of the issuance of the preliminary injunction is significantly outweighed by the irreparable harm plaintiff would continue to suffer as a result of defendants' violation of the Non-Compete Covenant.").

## D.   The public interest strongly favors entry of a temporary restraining order.

A TRO is firmly in the public interest.  Where, as here, "a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).  Moreover, there is a particular public interest in "protecting such trade secrets from misappropriations by those who have not devoted the time and investment to their development." *Ecolaire Inc. v. Crissman,* 542 F. Supp. 196, 211 (E.D. Pa. 1982).  And because the public has an interest in ensuring that parties abide by the terms of their contracts, the Court will best serve the public interest by upholding restrictive covenants freely entered into by the parties at issue. *See Wright*, 2 F. Supp. 2d at 709 (explaining that public interest is served by upholding a restrictive covenant entered into freely).  In doing so, courts will

"discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations." *Id.* As such, the public interest strongly favors entry of an TRO.

**E.    No injunction bond should be required.**

A court has the discretion to waive the Fed. R. Civ. P. 65(c) bond requirement. *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996). Courts may dispense with the filing of a bond when there is no realistic harm to the defendant from enjoining its conduct. *Id.* ("Where the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement."). Unisys' requested relief will cause no harm to Defendants during the period of the TRO because the Unisys trade secrets should never have been misappropriated in the first place and Defendants can find other employment, even at Atos. Accordingly, Unisys respectfully requests that the Court enter a TRO without requiring a bond.

**F.    The Court should authorize expedited discovery.**

"Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assoc. v. U.S.*, 917 F. Supp. 841, 844 (D.D.C. 1996); *see also TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 198 (3d Cir. 2001) (acknowledging district court's grant of expedited discovery in anticipation of hearing on preliminary injunction); *Acierno v. Mitchell*, 6 F.3d 970, 973 (3d Cir. 1993) (same); Fed. R. Civ. P. 26(d). "Expedited discovery has been ordered where it would better enable the court to judge the parties' interests and respective chances for success on the merits at a preliminary injunction hearing." *Phila. Newsp., Inc. v. Gannett Satellite Info. Network, Inc.*, No. 08-2782, 1998 WL 404820, at *2 (E.D. Pa. July 15, 1998) (citation omitted). In considering a motion for expedited discovery, "the court focuse[s] on the circumstances of the case:  the pending preliminary

injunction hearing, the need for discovery, and the breadth of the moving party's discovery requests." *Ent. Tech. Corp. v. Walt Disney Imagineering*, No. 03-3546, 2003 WL 22519440, at *3 (E.D. Pa. Oct. 2, 2003). "If narrowly tailored to fit the needs of the [injunction] hearing, leave to conduct expedited discovery [is] granted[;] [w]here the [discovery] requests are overly broad…leave is denied." *Id.*

Here, Unisys is seeking narrow, expedited discovery into Defendants' communications with Atos and between themselves from July 2022 through the present, the acquisition and current whereabouts of the Unisys materials that Defendants copied or otherwise retained after their employment at Unisys, Gilbert's communications with Unisys employees on or after October 2022, and depositions of Defendants. This quick, efficient discovery will aid the Court and the parties in reaching an expedited resolution.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant a temporary restraining order enjoining (1) Defendants from disclosing, retaining, or using any confidential or trade secret information of Unisys; (2) Defendants from working at Atos, and each of its affiliates, in its DWS business unit; and (3) Gilbert from soliciting any other Unisys employees to leave his or her employment at Unisys. Unisys also respectfully requests expedited discovery as set forth herein, along with a hearing and briefing schedule on Unisys' forthcoming motion for a preliminary injunction to occur prior to expiration for the temporary restraining order.

Dated: February 13, 2023                    Respectfully submitted,

                                            /s/ *Julian C. Williams*
                                            Julian C. Williams (S.B.N. 324771)
                                            julian.williams@morganlewis.com
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            1701 Market Street
                                            Philadelphia, PA 19103
                                            Phone: (215) 963-5000
                                            Fax: (215) 963-5001

                                            Robin Nunn (*pro hac vice* forthcoming)
                                            robin.nunn@morganlewis.com
                                            MORGAN, LEWIS & BOCKIUS LLP
                                            101 Park Avenue
                                            New York, New York 10178
                                            Phone: (212) 309-6779
                                            Fax: (212) 309-6001

                                            Michael W. De Vries (*pro hac vice*
                                            forthcoming)
                                            michael.devries@kirkland.com
                                            California S.B.N. 211001
                                            KIRKLAND & ELLIS LLP
                                            555 South Flower Street, Suite 3700
                                            Los Angeles, CA 90071
                                            Telephone: (213) 680-8400

                                            Adam R. Alper (*pro hac vice* forthcoming)
                                            adam.alper@kirkland.com
                                            California S.B.N. 196836
                                            KIRKLAND & ELLIS LLP
                                            555 California Street
                                            San Francisco, CA 94104
                                            Telephone: (415) 439-1400

                                            Gianni Cutri (*pro hac vice* forthcoming)
                                            Illinois S.B.N. 6272109
                                            gianni.cutri@kirkland.com
                                            KIRKLAND & ELLIS LLP
                                            300 North LaSalle
                                            Chicago, IL 60654
                                            Telephone: (312) 862-2000

                                            Leslie M. Schmidt (*pro hac vice* forthcoming)
                                            New York S.B.N. 4884078

leslie.schmidt@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800

*Attorneys for Plaintiff*
Unisys Corporation

## **CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served simultaneous with the Complaint in this action via process server on Leon Gilbert and Michael McGarvey.


DATED: February 13, 2023                    /s/ *Julian C. Williams*
                                                        Julian C. Williams