**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNISYS CORPORATION, | |
| Plaintiff, | |
| v. | Case No.  2:23-CV-0555 |
| LEON MR. GILBERT, and MICHAEL MR. MCGARVEY | JURY TRIAL DEMANDED |
| Defendants. | |

## DEFENDANTS LEON GILBERT AND MICHAEL MCGARVEY'S RESPONSE IN OPPOSITION TO PLAINTIFF UNISYS CORPORATION'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 4

    A.   Unisys's and Atos's DWS Business ............................................................ 4

    B.   Unisys's Recruitment of Defendants and Others from Atos ........................... 5

    C.   Defendants' Work for Unisys and Lack of Unisys Support ............................ 7

    D.   Defendants' Departure from Unisys .......................................................... 9

        1. Mr. Gilbert Discloses Plan to Leave Unisys Weeks Before Ending Employment ........... 9

        2. Mr. McGarvey Discloses Plan to Leave Unisys Before Ending Employment ................ 11

LEGAL STANDARD ................................................................................................ 13

ARGUMENT ........................................................................................................... 14

    A.   Unisys Is Not Likely to Succeed on the Merits of its Trade Secrets Claims ............... 15

        1. Unisys Failed to Demonstrate a Likelihood of Success on Its Trade Secrets Claims .... 15

        a.   Unisys Has Not Identified Any Specific Trade Secrets ............................... 15

        b.   Unisys Has Not Shown Actual Misappropriation ..................................... 18

        c.   There Is No Threatened Misappropriation .............................................. 24

        2. Unisys Is Not Likely to Succeed in Establishing Ongoing or Future Breach of Defendants' Employment Contracts .................................................... 26

    B.   Unisys Fails to Show That the Remaining Factors Favor a Temporary Restraining Order ....................................................................................... 28

        1. Unisys Fails to Show It Would be Irreparably Harmed Absent a TRO ...................... 28

        2. Unisys's Requested Injunction Should be Denied because It Places Undue Hardship on Mr. Gilbert and Mr. McGarvey ....................................... 30

        3. The Public Interest Does Not Favor Granting Injunctive Relief .......................... 32

    C.   If the Court Determines Preliminary Relief is Necessary, Unisys Should Be Required to Post Bond ..................................................................... 33

    D.   The Court Should Deny Unisys's Request for Expedited Discovery ...................... 34

CONCLUSION ......................................................................................................... 35

-i-

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acierno v. New Castle Cnty.*,
   40 F.3d 645 (3d Cir. 1994)..................................................................................27

*Adams v. Freedom Forge Corp.*,
   204 F.3d 475 (3d Cir. 2000)................................................................................28

*ADP, Inc. v. LaCivita*,
   No. 21-CV-20001, 2022 WL 5177374 (D.N.J. June 30, 2022)..........................24

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*,
   669 F.3d 359 (3d Cir. 2012)................................................................................27

*ASI Bus. Sols., Inc. v. Otsuka Am. Pharm., Inc.*,
   233 F. Supp. 3d 432 (E.D. Pa. 2017) .............................................................16, 28

*Bimbo Bakeries USA, Inc. v. Botticella*,
   613 F.3d 102 (3d Cir. 2010)................................................................................13

*Cerro Fabricated Prods. LLC v. Solanick*,
   300 F. Supp. 3d 632 (M.D. Pa. 2018)................................................................24

*CertainTeed Ceilings Corp. v. Aiken*,
   No. 14-3925, 2014 WL 5461546 (E.D. Pa. Oct. 24, 2014) ...............................29

*Colorcon, Inc. v. Lewis*,
   792 F. Supp. 2d 786 (E.D. Pa. 2011) .........................................................29, 31, 32

*Cont'l Grp., Inc. v. Amoco Chems. Corp.*,
   614 F.2d 351 (3d Cir. 1980)................................................................................27

*Countour Data Sols. LLC v. Gridforce Energy Mgmt. LLC*,
   No. 20-CV-3241, 2021 WL 5536266 (E.D. Pa. Sept. 2, 2021) ...................15, 16, 27

*Coventry First, LLC v. Ingrassia*,
   No. 05-CV-2802, 2005 WL 1625042 (E.D. Pa. July 11, 2005)..........................32

*E.R. Squibb & Sons, Inc. v. Hollister, Inc.*,
   No. 91-CV-203, 1991 WL 15296 (D.N.J. Feb. 5, 1991) .........................................24

*Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*,
   540 F. Supp. 3d 491 (E.D. Pa. 2021) ........................................................19, 28, 29

*First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*,
    155 F. Supp. 2d 194 (M.D. Pa. 2001) ............................................................1, 25

*Freedom Med. Inc. v. Whitman*,
    343 F. Supp. 3d 509 (E.D. Pa. 2018) ...........................................................14, 15

*Fulton v. City of Philadelphia*,
    320 F. Supp. 3d 661 (E.D. Pa. 2018), *aff'd*, 922 F.3d 140 (3d Cir. 2019)............14

*Givaudan Fragrances Corp. v. Krivda*,
    639 Fed. App'x 840 (3d Cir. 2016).....................................................................16

*Greenberg v. Haggerty*,
    No. CV 20-3822, 2020 WL 7227251 (E.D. Pa. Dec. 8, 2020) ...................13, 14, 15

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989)................................................................................28

*Kos Pharm., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004)................................................................................13

*Mettler-Toledo, Inc. v. Acker*,
    908 F. Supp. 240 (M.D. Pa. 1995) ......................................................................31

*Miller v. Mitchell*,
    598 F.3d 139 (3d Cir. 2010)................................................................................14

*NCAA v. Governor of New Jersey*,
    939 F.3d 597 (3d Cir. 2019)................................................................................32

*Philadelphia Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*,
    1998 WL 404820 (E.D. Pa. July 15, 1998)...........................................................34

*Pileggi v. Aichele*,
    843 F. Supp. 2d 584 (E.D. Pa. 2012) ..................................................................13

*Syngy, Inc. v. ZS Assocs., Inc.*,
    No. 07-CV-3536, 2013 WL 3716518 (E.D. Pa. July 15, 2013)...............................16

*TES Franchising v. Dombach*,
    No. 10-CV-0017, 2010 WL 3946274 (E.D. Pa. Oct. 7, 2010) ...............................26

*Van Prods. Co. v. Gen. Welding & Fabricating Co.*,
    419 Pa. 248 (1965)............................................................................................24

**Statutes**

Defend Trade Secrets Act ...........................................................................................15

Pennsylvania Uniform Trade Secrets Act..........................................................................15

**Other Authorities**

Federal Rule of Civil Procedure 65 .........................................................................13, 32

## **INTRODUCTION**

Unisys seeks a temporary restraining order against Defendants Mr. Leon Gilbert and Mr. Michael McGarvey, to prevent them, *inter alia*, from working with Atos.  Unisys's motion fails both factually and legally and should be denied.

*First*, in order to show a likelihood of success on the merits in a trade secret case, Unisys must define the trade secrets with specificity.  Unisys has not identified a single trade secret. Instead, it has identified only generic categories of documents, such as "business strategies," "architecture designs," "client contracts with pricing information," "roadmaps and technical specifications," and "training tools."  Such a general listing is insufficient under the law.  Rather, Unisys must demonstrate that it owns actual secrets with a value to the company – general categories of documents are not secrets.

*Second*, while Unisys has identified alleged acts of misappropriation, the full facts behind those allegations – of which Unisys should be aware – demonstrate that there has been no misappropriation.

**Mr. McGarvey's Alleged 13,000 Downloads**:  Unisys accuses Mr. McGarvey of downloading onto his personal computer 13,000 documents.  This is not true.  Mr. McGarvey, pursuant to a Unisys policy, used his own device during his employment with Unisys.  Unisys controlled this device, to the extent that Mr. McGarvey could not even access his personal computer without using his Unisys credentials.  When Mr. McGarvey decided he was leaving Unisys, he synched these documents to his personal computer so that he could create a transition folder for his successor at Unisys.  However, Mr. McGarvey was unable to complete that transition because Unisys cut his access to his laptop one week before his termination date.  At that point, Mr. McGarvey had no access to the documents, or any documents at Unisys.  After discussing it with Unisys, Mr. McGarvey reset his personal laptop, which included wiping his hard drive clean.

Thus, Mr. McGarvey only had access to those documents when he was performing his duties for Unisys, and he does not have access to those documents now.  Nor did he make any copies of those documents and did not, nor could he, share those documents with Atos.

**Mr. McGarvey's Alleged Access of Atos Servers**:  Unisys accuses Mr. McGarvey of accessing Atos servers before leaving Unisys.  This is not true.  On several occasions, due to old Atos bookmarks on his computer, a link directed Mr. McGarvey's computer to an Atos sign-on page.  (As explained below, Mr. McGarvey worked for Atos before he worked for Unisys.)  However, Mr. McGarvey got no further than the sign-on page, because he did not intend to access that page, nor did he have credentials that would have allowed him to get beyond the sign-on page.

**Mr. McGarvey's Alleged Forwarding of Email**:  Unisys accuses Mr. McGarvey of forwarding an email from his Unisys-controlled laptop to himself.  This email is actually from December 2019 (when he was still with Atos before joining Unisys), and contains personal information Mr. McGarvey needed for tax purposes.  It contains no Unisys information.

**Mr. Gilbert's Alleged November 2022 Email**:  Unisys accuses Mr. Gilbert of sending an email containing Unisys information to a person at Atos in November 2022.  The person to whom this email was directed was actually a former Atos employee who was employed by Unisys in November 2022.  Mr. Gilbert accidently used the old email, but when he received an indication the email was undeliverable (because the recipient was no longer at Atos), he sent it again to the recipient's Unisys email address.  Presumably Unisys's forensic analysis of Mr. Gilbert's emails shows that he received the notification the email was undeliverable.

**Mr. Gilbert's Alleged WhatsApp Message**:  Unisys accuses Mr. Gilbert of indicating to Atos that he would bring confidential information to Atos based on a message saying that he spent the last two years at Unisys working on the same model Atos was trying to achieve.

2

Unisys mistakes the context of this email.  When Mr. Gilbert joined Unisys in 2020, Unisys was working with outside consultant McKinsey to change certain organizational aspects of its business. When Mr. Gilbert was leaving Unisys to rejoin Atos, he learned that Atos was using the same outside consultant to make the same type of organizational changes.  Thus, he said he was familiar with the model.

**Mr. Gilbert's Alleged Transfer of Files to His Google Drive**:  Unisys accuses Mr. Gilbert of transferring documents from Unisys to his personal Google Drive.  In fact, Mr. Gilbert's wife and daughter transferred these documents, which were photos of Mr. Gilbert's daughter for use in her high school yearbook, not Unisys documents.

*Third*, in addition to omitting contextual information that Unisys certainly has, based on its forensic analysis of Mr. McGarvey's and Mr. Gilbert's devices, Unisys also omits other significant facts.  Unisys fails to mention that Mr. McGarvey and Mr. Gilbert both worked for Atos for years before being lured over to Unisys in 2020.  In addition, while Unisys attempts to paint a picture where it is the leading company in this industry, in fact, outside consultants rate Atos as second in the industry and Unisys as fifth or sixth.  Indeed, Mr. McGarvey and Mr. Gilbert were hired by Unisys to try to bring Unisys's offerings up to industry standards.

*Fourth*, Unisys is seeking to prevent Mr. McGarvey and Mr. Gilbert from working at Atos. But notably, Mr. McGarvey and Mr. Gilbert did not have non-compete agreements with Unisys. In essence, Unisys is attempting to create a non-compete contract where one does not exist.

Unisys seeks three specific prohibitions in its motion.  It seeks to prevent the Defendants (1) from disclosing, retaining, or using any confidential or trade secret information of Unisys; (2) from working in field of digital workplace services; and (3) from soliciting any Unisys employees to leave their employment.  The Defendants have no issue with agreeing to parts (1) and (3), as

they have no Unisys confidential or trade secret information, and have no intention of soliciting Unisys employees.  However, because Unisys has not specifically identified any trade secrets, because no trade secrets have in fact been misappropriated, and because the Defendants did not have non-compete agreements with Unisys, point (2) of Unisys's motion must be denied.

## **BACKGROUND**

### A.    **Unisys's and Atos's DWS Business**

Atos is a global leader in digital transformation, providing cybersecurity, cloud, and high-performance computing services to clients across all industries and in 71 countries.  Decl. of L. Mr. Gilbert ("Gilbert Decl.") ¶ 5.  Atos's portfolio of services ranges from digital consulting and cloud infrastructure to artificial intelligence and digital automation.  *Id.*  Atos is also an industry leader in digital workplace solutions/digital workplace (DWS/DWP), designing and implementing end-to-end digital ecosystems and applications that allow its clients to securely manage their files, facilitate employee collaboration, and increase productivity and innovation.  *Id.* ¶ 6.  For years, Atos's DWS services have earned independent recognition for their superior quality, including being consistently ranked as second in the industry by third-party analysts.  *Id.* ¶ 8; Decl. of M. McGarvey ("McGarvey Decl.") ¶ 118, Ex. 3 (Gartner Reprint).  As a testament to Atos's reputation, its revenues for DWP/DWS services have also exceeded $2 billion annually for the past few years.  Gilbert Decl. ¶ 7.

On the other hand, Unisys has for years lagged behind Atos and its other competitors in the DWP/DWS marketplace.  *Id.* ¶ 8.  In fact, while Atos has consistently maintained its position at the forefront of the industry, Unisys's position in the marketplace has ***fallen*** according to third-party analysts during the same period in which Unisys now claims it leapfrogged over its competition.  McGarvey Decl. ¶ 118, Ex. 3 (Gartner Reprint).  As just one third-party analyst found in 2022, while Atos falls in the "Leader" category in DWP/DWS, meaning it "deliver[s]

[its] service solutions skillfully, ha[s] a clear vision of the direction of the service market, and [is] actively building and improving [its] competencies to sustain its leadership position," Unisys remains a "Challenger," meaning it "execute[s] well, but ha[s] less well-defined views of the market's direction." *See* McGarvey Decl., Ex. 3 (Gartner Report) at 27. As evidence of its undefined position in the market, Unisys' business is significantly smaller than Atos's business in terms of revenue, clients, and market visibility. Gilbert Decl. ¶ 37.

### B.    Unisys's Recruitment of Defendants and Others from Atos

Unisys's failure to compete on the same level as Atos and others in the DWS industry is not without trying. Recognizing that its DWP/DWS business required a significant rebuild, Unisys approached Mr. Gilbert in December 2020 to ask if he would be willing to serve as the senior vice president of its DWP/DWS unit. Gilbert Decl. ¶ 10.

Mr. Gilbert graduated in 1995 from The Manchester Metropolitan University with a degree information technology. *Id.* ¶ 3. Over the course of the next approximately thirty years, Mr. Gilbert worked in the DWP/DWS industry at a number of respected companies, including but not limited to Valoris, Severn Trent, Pipex, mBlox, Marsh and McLennan Companies, Inc, and Atos. *Id.* ¶ 4.

Mr. Gilbert first began working for Atos's DWS/DWP division in September 2014. *Id.* Over the next approximately six years, Mr. Gilbert held a variety of senior executive roles at Atos, including roles as Vice President of DWP/End Users Services for North America; global executive for one of Atos's largest DWS/DWP clients; and ultimately global head of Atos's DWP/DWS division. *Id.* ¶ 9. He became intimately familiar with Atos's business, strategies, and competitive posture within the DWS/DWP industry. *Id.* ¶ 18. In these positions, Mr. Gilbert also continued to build upon his already significant DWP/DWS industry experience, helping Atos's team generate nearly $2 billion in revenue per year from 2015 to when he left Atos in early 2021. *Id.* ¶ 7. Mr.

Gilbert is therefore a well-known, well-respected player in the DWP/DWS industry, and was long before he joined the Unisys team.

At the time Unisys approached Mr. Gilbert, Unisys invited Mr. Gilbert to meet with its senior executive team, including its CEO and chairman Peter Altabef and its COO and president Eric Hutto, who explained that they intended to completely reorganize their DWS/DWP unit using a plan developed by outside consultants McKinsey & Company ("McKinsey"). *Id.* ¶ 10. Excited by the prospect of rebuilding Unisys's DWP/DWS practice, Mr. Gilbert accepted Unisys's offer in January 2021. *Id.* ¶ 11.

Unisys's recruitment did not end with Mr. Gilbert. Shortly after Mr. Gilbert joined the company, Unisys reached out to Mr. McGarvey, who was then a client manager for some of Atos's largest clients in the DWP/DWS space and a driving technical mind behind Atos's DWP/DWS operations. McGarvey Decl. ¶ 12.

Like Mr. Gilbert, Mr. McGarvey worked for decades in the DWS/DWP space before joining Unisys. In fact, although he would not graduate from the Pennsylvania State University until May 2011 with his degree in Bachelor of Science in Information Sciences and Technology, Mr. McGarvey was so interested in the DWP/DWS space that he actively pursued a career in that field while still in school. *Id.* ¶¶ 3-5.

Through his efforts, Mr. McGarvey secured a position with Siemens IT Solutions and Services in 2005 and continued to work for that company for his entire college experience. *Id.* ¶ 5. Demonstrating hard work and aptitude, Siemens quickly promoted Mr. McGarvey despite the fact that he had yet to graduate college, trusting him with information technology architecture roles and even a position as Chief Technology Officer for many of Siemens's important DWS/DWP clients. *Id.* ¶ 6. In 2011, when Mr. McGarvey graduated with honors, it was therefore no surprise

6

that Atos elected to not just keep Mr. McGarvey employed after Atos acquired Siemens but continued to recognize and promote Mr. McGarvey within Atos's DWS/DWP division. *Id.* ¶¶ 7-8.

Over the next ten years, Mr. McGarvey worked in various roles in Atos's DWS/DWP division, including executive positions such as DWP Architecture, Client Account DWP CTO, and Global DWP CTO. *Id.* ¶ 10. Like Mr. Gilbert, Mr. McGarvey became intimately familiar with Atos's business, strategies, and market position. *Id.* He also developed and honed his significant professional experience that continues to shape how he approaches his work today. Although junior to Mr. Gilbert, Mr. McGarvey's over twenty years of DWP/DWS experience, not to mention his passion and solitary focus on this industry, make him a well-respected, well-known professional too.

Mr. McGarvey agreed to join Unisys alongside his former Atos colleague, Mr. Gilbert. *Id.* ¶¶ 12-15. Although Defendants signed confidentiality agreements with Unisys, neither Mr. Gilbert nor Mr. McGarvey signed noncompete agreements. Gilbert Decl. ¶ 17; McGarvey Decl. ¶ 16.

Ultimately, spurred by its recruitment of Defendants, Unisys continued to recruit more than ten (10) additional employees from Atos to its DWP/DWS practice throughout 2021 and 2022. Gilbert Decl. ¶ 15.

### C. Defendants' Work for Unisys and Lack of Unisys Support

Defendants joined Unisys with the primary objectives of replacing Unisys's DWP/DWS leadership team, implementing its "build by partner" approach that emphasized strategic business partnerships and acquisitions, and modernizing the DWP/DWS service and product offerings to better compete with Atos and others. Gilbert Decl. ¶¶ 20-22. A significant focus of Defendants' work for Unisys was strategic mergers and acquisitions that would allow the DWP/DWS unit to

(a) modernize its capabilities by onboarding additional services and products, and (b) scale the business such that it could effectively provide services to more clients, thereby increasing sales. *Id.* ¶ 22; McGarvey Decl. ¶ 29.  This would allow Defendants to help Unisys to achieve its goals without significant expenditures of R&D resources.  Gilbert Decl. ¶¶ 20-22.

Early on, Unisys supported Defendants' strategic goals, including acquiring two companies, Unify Square, Inc. and Mobinergy Energy, that helped bring in additional capabilities and products that Atos and others in the DWP/DWS marketplace already had.  *Id.* ¶ 23. Defendants were also able to buildout Unisys's capabilities internally to improve its product offerings.  *Id.*

However, when it came to the second part of Defendants' strategy—scaling the business— Unisys failed to provide the necessary support and investment to achieve Defendants' objectives. In particular, Unisys failed to execute several prospective mergers and acquisitions that would have allowed Unisys to rapidly scale the company, leaving Defendants with a DWP/DWS business that had the necessary capabilities to compete but without the support of a large-scale enterprise to effectively deliver the new capabilities to clients.  Gilbert Decl. ¶ 24.  Unisys also lacked the sales support—an area of the business outside of Defendants' control—to market the company's DWP/DWS offerings to new clients.  *Id.*

The result was a DWP/DWS business at Unisys that was internally capable but handicapped by Unisys's failed growth.  *Id.*  Indeed, although Defendants delivered on their other objectives, including increasing the ratings of Unisys's DWP/DWS services by third-party analysts, Unisys remained behind others in the industry, including Atos, according to those same reviews.  *Id.* ¶ 25.  After two years at the company, Defendants' efforts to rebuild the company's DWP/DWS practice lacked the necessary external support to allow the DWP/DWS business to

progress.  *Id.* ¶ 26.

### D.    Defendants' Departure from Unisys

Although neither Mr. Gilbert nor Mr. McGarvey were actively considering leaving Unisys to return to Atos in the winter of 2022, both ultimately made the decision to do so in January 2023 after Atos began recruiting them, in a fashion similar to what Unisys had done just two years prior. Specifically, in or around December 2022, Atos approached Mr. Gilbert about rejoining Atos's DWP/DWS team as its Senior Vice President of Digital Workplace.  Gilbert Decl. ¶ 27.  Atos likewise approached Mr. McGarvey in or around the 2022 Christmas/New Year's holidays about rejoining its DWP/DWS division.  McGarvey Decl. ¶ 30.  Understanding that they were not subject to a noncompete agreement with Unisys, and desiring for many reasons to go back to their prior employer with whom both already had significant familiarity and positive reputations, Mr. Gilbert and Mr. McGarvey decided in early January to accept Atos's offer.  Gilbert Decl. ¶¶ 27-28; McGarvey Decl. ¶¶ 30-32.  Both then took steps to ensure that their departures from Unisys would be as above board as possible and would cause minimal disruption to Unisys's operations.

#### 1.    *Mr. Gilbert Discloses Plan to Leave Unisys Weeks Before Ending Employment*

In the first week of January 2023, Mr. Gilbert informed Unisys executives that Atos had approached him about rejoining Atos's team.  Gilbert Decl. ¶ 30.  Unisys responded by trying to convince Mr. Gilbert to stay, including offering him a higher salary.  *Id.* ¶¶ 30, 34.  Although Mr. Gilbert considered Unisys's offer in good faith, he rejected Unisys's efforts to keep him due to his commitment to return to Atos.  *Id.*

On January 11, 2023, before a meeting of Unisys leadership team, Mr. Gilbert confirmed to Unisys's CEO Mr. Altabef that he would be leaving at the end of the month, on January 27, 2023.  *Id.* ¶ 31.  Despite this disclosure, Mr. Altabef and the other Unisys executives insisted that

Mr. Gilbert nevertheless participate in the leadership meeting and attend the related events. *Id.* Those same executives likewise praised Mr. Gilbert for his work on behalf of the company, even toasting him at a dinner that evening. *Id.* ¶¶ 31-33.

Understandably, another Unisys employee—Lisa Maddion—who attended the leadership meeting and subsequent social events expressed to Mr. Gilbert her personal upset that Mr. Gilbert would be leaving Unisys. *Id.* ¶ 35, 66-68. Over the course of the evening, Mr. Gilbert and Ms. Maddion spoke about Ms. Maddion's own desires to leave Unisys. *Id.* Throughout the conversation, Mr. Gilbert was careful to be clear that it was his understanding that, although he enjoyed working with her, he was not permitted to directly or indirectly recruit Ms. Maddion for at least a year after he left Unisys. *Id.* Out of a personal desire to make sure she was not angry with him, he subsequently followed up with her by text message around 11 pm that evening, expressing that, if she continued to be interested in coming to Atos after his non-solicitation restriction lapsed, he would help her make that happen. *Id.* ¶ 68.

Since that conversation, Mr. Gilbert has been clear with other Unisys's employees that have reached out to him that it is his understanding he is not allowed to solicit them to come to Atos. *Id.* ¶¶ 66-71, 79. Mr. Gilbert has not—and has no intention of—violating that restriction. *Id.*

Similarly, Unisys terminated Mr. Gilbert's ability to access Unisys's servers, his Unisys-issued laptop, and therefore any possible Unisys trade secrets or confidential information on January 27, 2023, when Unisys terminated Mr. Gilbert's credentials. *Id.* ¶ 61. Mr. Gilbert has not accessed or used any even arguable Unisys trade secret or confidential information since that day. *Id.* ¶¶ 61-65. He has not shared any claimed Unisys trade secret or confidential information with anyone, let alone anyone at Atos. *Id.* And Mr. Gilbert has no intent, desire, or reason to do so.

*Id.* ¶¶ 61-65, 78.

Prior to the filing of this lawsuit—and therefore contrary to Unisys's claims—Mr. Gilbert did take steps to return his Unisys-issued laptop on Saturday, February 11, 2023, using the instructions Unisys provided to him.  *Id.* ¶¶ 60-61.  Mr. Gilbert did not intentionally delay in returning his laptop nor did he believe he was not acting diligently enough as no one at Unisys had asked that he return the laptop by a specific date.  *Id.*  Mr. Gilbert simply works remotely from Kentucky, and due to family commitments and the time it takes him to get to a FedEx store from his home, Saturday, February 11 was the first date after his employment ended that he was able to deposit the laptop for next business day delivery.  *Id.*  Again, Mr. Gilbert had no access to the laptop during this period of time because Unisys had terminated his credentials.  *Id.*  In any event, Mr. Gilbert did not even try to access, let alone use, the Unisys-issued laptop after January 27, 2023.  *Id.* ¶¶ 61-65.

### 2.      *Mr. McGarvey Discloses Plan to Leave Unisys Before Ending Employment.*

Around January 5, 2023, Mr. McGarvey accepted Atos's re-employment offer, and with it, Atos's request that Mr. McGarvey's first day be about a month later on February 6.  McGarvey Decl. ¶ 34.  As the primary breadwinner of his family, Mr. McGarvey wanted to avoid any gap in his employment and therefore decided to wait to provide formal notice to Unisys until closer to his desired last day.  *Id.* ¶ 36.  In the meantime, Mr. Gilbert announced his departure, which prompted Unisys COO Michael Thomson to call Mr. McGarvey with an offer to take Mr. Gilbert's position. *Id.* ¶ 38.  Even though it was earlier than he had wanted to give notice, Mr. McGarvey was upfront with Thomson and informed him at that point that Mr. McGarvey would be leaving to go back to Atos as well.  *Id.* ¶¶ 39-40.

Both prior to and after that call, Mr. McGarvey continued to perform diligently in his role

at Unisys, never once stopping or shifting his focus to his future employment at Atos.  In fact—knowing that both he and Mr. Gilbert would be leaving around the same time—Mr. McGarvey began on his own initiative putting together a transition package for the person who would take over his role at Unisys in order to minimize disruption and leave Unisys in the best position to continue improving its DWP/DWS business.  *Id.* ¶ 41.  As discussed more fully below, it was this process that resulted in Mr. McGarvey opening and reviewing the approximately 13,000 documents Unisys complains about in its papers—all of which remained on Unisys's servers and within Unisys's control, and none of which were downloaded or taken by Mr. McGarvey, let alone part of some conspiracy to benefit Atos.  *See infra* § A.2.  Mr. McGarvey openly continued this voluntary process of creating transition materials, communicating directly about his efforts with Mr. Gilbert's successor—Joel Raper—after he was identified.  McGarvey Decl. ¶ 71.

Ultimately, however, Mr. McGarvey was unable to finish pulling together these materials because, although his final day would not be until February 5, 2023, Unisys suspended Mr. McGarvey's credentials on January 27, 2023, thereby blocking his access not just to additional Unisys materials but the materials he had already pulled together as part of the transition package—which were stored on Unisys's OneDrive.  *Id.* ¶¶ 53-76.  Despite being on a pre-planned Disney vacation with his family at that time, Mr. McGarvey alerted Mr. Raper (Mr. Gilbert's successor) about this via text message on January 27, 2022, explicitly stating that his lack of access meant Mr. McGarvey would be unable to finish putting together the transition package.[1]  *Id.* ¶ 71, Ex. 1.

Since Unisys terminated his credentials on January 27, 2023, Mr. McGarvey has not had

---

[1] As discussed below, Mr. McGarvey's trip to Disney explains his alleged visit to alleged "Atos internal website" in November 2022.  McGarvey Decl. ¶ 84.

access to, or attempted to gain access to, any Unisys trade secrets or confidential information. *Id.* ¶¶ 53-76. In fact, although Mr. McGarvey had been using with Unisys's permission Mr. McGarvey's personal laptop as part of Unisys's BYOD program for over a year, Unisys's deactivation of Mr. McGarvey's credentials actually prevented Mr. McGarvey from even accessing the laptop's local drive because he could not sign into the only User profile that existed—which required valid Unisys credentials. *Id.* ¶ 67. Perfectly comfortable with—and in fact desiring to ensure—that he had no access to Unisys information, Mr. McGarvey used the Windows 11 restorer program to wipe his personal laptop twice before even having any hint that this lawsuit was coming: the first time on January 27, 2023; and again on February 5, 2023. *Id.* ¶ 73. He has at no point prior to or after that shared any claimed Unisys trade secret or confidential information with anyone, let alone anyone at Atos. *Id.* ¶¶ 48-52, 93-94. And Mr. McGarvey has no intent, desire, reason, or ability to do so. *Id.*

## **LEGAL STANDARD**

Although available in limited circumstances, it is well-established that "[a] preliminary injunction is an extraordinary remedy [that is] never awarded as of right." *Greenberg v. Haggerty*, No. CV 20-3822, 2020 WL 7227251, at *3 (E.D. Pa. Dec. 8, 2020) (Kenney, J.) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). Instead, to obtain temporary relief against Mr. Gilbert and Mr. McGarvey under Federal Rule of Civil Procedure 65 in the form of either a TRO or a preliminary injunction, Unisys must demonstrate for each defendant independent of the other that: (1) Unisys's claims against that specific individual are likely to succeed on the merits; (2) that Unisys will suffer irreparable harm if the injunction against that individual is denied; (3) that granting preliminary relief will not result in greater harm to that individual than denying it

would to Unisys; and (4) that public interest favors such relief.[2] *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010); *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (citing *Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004)).

The first two factors are often considered "gateway factors," such that a "court must first determine whether the movant has met these two gateway factors before considering the remaining two factors—balance of harms, and public interest." *See Fulton v. City of Philadelphia*, 320 F. Supp. 3d 661, 675 (E.D. Pa. 2018), *aff'd*, 922 F.3d 140 (3d Cir. 2019). Unisys's "failure to establish any element . . . renders a preliminary injunction inappropriate." *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 517-18 (E.D. Pa. 2018) (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)). "Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing that the plaintiff is entitled to such relief.'" *Greenberg*, 2020 WL 7227251, at *3.

## ARGUMENT

Because Defendants do not currently possess and have not accessed any Unisys confidential or trade secret information since their employment with Unisys ended, they agree to Unisys's requested TRO enjoining them from disclosing, retaining, or using any such information. Gilbert Decl. ¶ 78; McGarvey Decl. ¶ 52. Mr. Gilbert also agrees to Unisys's request to enjoin him from soliciting Unisys employees during the pendency of this lawsuit, though only to the extent he would be enjoined by the non-solicitation provision in his compensation agreement. Gilbert Decl. ¶ 79.

---

[2] The factors for granting an application for a temporary restraining order are the same as those for granting a preliminary injunction. *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012) (Surrick, J.).

Accordingly, the only question before the Court in deciding whether to grant Plaintiff's TRO is whether Defendants should be enjoined from working at Atos in the field of DWP/DWS, or at any other competitor of Unisys, regardless of field of employment. Under each of the required factors, Unisys fails to meet its burden to justify the extraordinary remedy it seeks.

### A.     Unisys Is Not Likely to Succeed on the Merits of its Trade Secrets Claims

Unisys's Complaint alleges two types of claims:  (a) trade secrets claims based on the Defend Trade Secrets Act ("DTSA") and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"); and (b) breach of contract claims against both Defendants based on alleged disclosure of confidential information, as well as a breach claim against Mr. Gilbert only based on his alleged breach of his non-solicitation agreement. *See* TRO Mem. at 12; Compl., Dkt. 1 at ¶¶ 51-83.  To demonstrate the likelihood of success required to support preliminary relief, Unisys must make "a clear showing" that it will likely be able to prove each element of those claims against Mr. Gilbert and Mr. McGarvey separately. *Greenberg*, 2020 WL 7227251, at *3.  For the reasons that follow, Unisys has not—and cannot—make that showing here.

### 1.     Unisys Failed to Demonstrate a Likelihood of Success on Its Trade Secrets Claims

Both Unisys's federal and state statutory trade secret claims require proof of, among other things, (1) the existence of specifically defined trade secrets, and (2) actual or threatened misappropriation of the same. *See Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 518 n.6 (E.D. Pa. 2018) (stating that both the DTSA and PUTSA proscribe the same conduct and protect essentially the same type of information).   Unisys fails to support either element in its Motion. The temporary restraining order must therefore be denied.

### a.     Unisys Has Not Identified Any Specific Trade Secrets

Courts have repeatedly made clear that trade secret plaintiffs must identify their alleged trade secrets with specificity and cannot rely on blanket or conclusory claims of secrecy in order to maintain a viable claim. *See Countour Data Sols. LLC v. Gridforce Energy Mgmt. LLC*, No. 20-CV-3241, 2021 WL 5536266, at *9 (E.D. Pa. Sept. 2, 2021) (Rufe, J.). "'This identification must be particular enough as to separate the trade secret from matters of general knowledge in the trade of or special knowledge of persons skilled in the trade.'" *Id.* (citation omitted). "[G]eneral allegations and generic references to the alleged trade secrets are [therefore] insufficient to satisfy plaintiff's burden of identifying its misappropriated trade secrets with reasonable particularity." *Id.* (alterations and quotations omitted).

Here, Unisys offers nothing but generic claims that it possesses trade secrets that Mr. Gilbert and Mr. McGarvey allegedly misappropriated, including but not limited to references to "business strategies," "architecture designs," "client contracts with pricing information," "roadmaps and technical specifications," "presentations," and "training tools" related to its products. Compl. ¶ 28; *see also* TRO Mem. at 15-16; Tomson Decl. ¶¶ 15-32. Notably, however, Unisys identifies nothing within these general categories to support its claims that this information is in fact **secret**. Nor does Unisys point to specific content in even a single specific document that it claims Mr. McGarvey or Mr. Gilbert took to explain what exactly within that document is allegedly secret. These generic descriptions fall significantly short of Unisys's burden to identify its secrets with sufficient specificity and are therefore fatal to its TRO request. *See, e.g.*, *Givaudan Fragrances Corp. v. Krivda*, 639 Fed. App'x 840, 845 (3d Cir. 2016) (affirming grant of summary judgment to defendant when former employer alleged misappropriation of "formulas" without specifying exact ingredients of those formulas); *Contour Data*, 2021 WL 5536266, at *10-12 (finding no likelihood of success on trade secrets claim when movant identified only general

categories of technology with purported trade secret value); *ASI Bus. Sols., Inc. v. Otsuka Am. Pharm., Inc.*, 233 F. Supp. 3d 432, 440 (E.D. Pa. 2017) (finding no likelihood of success when the plaintiff had not shown how general categories of information, including "installation packages," "backup tapes," and "hard-copy documentation," was "so 'special' or 'peculiar' as to warrant injunctive relief"); *Syngy, Inc. v. ZS Assocs., Inc.*, No. 07-CV-3536, 2013 WL 3716518, at *2 (E.D. Pa. July 15, 2013) (O'Neill, J.) (quoting *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 254 F.R.D. 463, 467 (M.D. Fla. 2008), for proposition that "[I]t is insufficient to describe the trade secrets by generic category .... Rather, [the plaintiff] must identify the specific characteristics of each trade secret, such as a particular drawing, process, procedure or cost/pricing data").

Unisys cannot avoid that result by claiming that it needs discovery to flesh out its claims or that it should be able to support its requested relief with generalities at this stage. Unisys is in exclusive possession of information about what it will claim is secret. And any suggestion that Unisys's information should be treated as per se secret is not just contrary to the law but is also negated by Unisys's own actions. By way of example only, Unisys itself repeatedly and publicly disseminates information about its operations, processes, strategies, and the other generic categories of information that it is now attempt to claim are secret in many ways, including but not limited to by applying for and obtaining patent registrations for its processes; encouraging employees like Mr. Gilbert and Mr. McGarvey to make public presentations about Unisys's strategy that are subsequently posted to widely available Internet sites like YouTube; and disclosing information to third-party analysts like Gartner for use in industry publications that are accessible by anyone willing to pay for a subscription to the report. Gilbert Decl. ¶ 38.

####    b.    *Unisys Has Not Shown Actual Misappropriation*

####        i.    *Mr. McGarvey Did Not Take Any Unisys Trade Secrets or Confidential Information*

Unisys's papers include four allegations specific to Mr. McGarvey that Unisys claims demonstrate misappropriation: (a) alleged downloading of 13,000 documents onto Mr. McGarvey's Unisys-approved personal laptop; (b) two instances in which Mr. McGarvey allegedly accessed Atos servers/websites; and (c) Mr. McGarvey's forwarding of an email with the word "Atos" in it to his personal email account.  TRO Mem. at 7-11.  The facts reveal there has been no misappropriation.

**Mr. McGarvey Did Not Download 13,000 Documents.** Unisys's TRO application is primarily based on accusations that Mr. McGarvey allegedly downloaded 13,000 "confidential technical and business strategy documents" onto his personal laptop.[3]  TRO Mem. at 2, 19.  In reality, Mr. McGarvey neither downloaded Unisys documents on his laptop nor had access to any Unisys documents following termination of his employee credentials on January 27, 2023. McGarvey Decl. ¶¶ 53-76.

Specifically, as discussed above, from July 2021 through the end of his employment, Mr. McGarvey used his personal laptop in lieu of a Unisys-issued one with full knowledge and approval from Unisys through Unisys's BYOD program.[4]  *Id.* ¶¶ 19-28.  In early January 2023 after making the decision to return to Atos, Mr. McGarvey proactively began reviewing Unisys documents to put together a transition package for his successor that consisted of a culled down

---

[3] Tellingly, Unisys does not state with specificity what "confidential" information is actually contained in these 13,000 documents.

[4] Unisys argues that Mr. McGarvey's failure to return his laptop is evidence of a desire to cover up misconduct.  That is untrue.  The laptop is owned personally by Mr. McGarvey, and with full knowledge and encouragement by Unisys, was twice wiped by Mr. McGarvey before he had any knowledge of this lawsuit.

universe of documents that Mr. McGarvey thought would be most useful when handing off his responsibilities. *Id.* ¶¶ 53-76. Although Unisys is using logs of these activities to claim that Mr. McGarvey downloaded 13,000 documents and then purportedly lied about doing so in his exit interview, nothing could be further from the truth.

Instead, as Unisys undoubtedly knows, because he worked remotely, Mr. McGarvey frequently used a Unisys-provided and approved method of accessing Unisys's OneDrive document repository that allowed his machine to create a temporary "synch" copy of the document through its local drive without Mr. McGarvey having to download and save the document to his laptop. *Id.* ¶¶ 58-64. This in turn prevented lags and delays that often occurred when accessing files solely through the OneDrive, while at the same time making it easy for Mr. McGarvey to create the transition package he was putting together on that Unisys-controlled server. *Id.* It was— and still is—also Mr. McGarvey's understanding that, by accessing the documents in this way, no real copy of the accessed documents would exist apart from the Unisys OneDrive server on his laptop. *Id.*

Accordingly, Unisys's claimed "crown jewel" evidence of misappropriation is reflective of the **<u>exact opposite</u>**: it is evidence of Mr. McGarvey working diligently during his final weeks at Unisys to put Unisys in the best position possible after his departure—a goal that he could not complete because Unisys terminated his access to not just Unisys's servers, but his laptop itself, on January 27, 2023. *Id.* ¶¶ 66-76. There is therefore no basis to find actual misappropriation by Mr. McGarvey. *See Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*, 540 F. Supp. 3d 491, 501 (E.D. Pa. 2021) (Schmehl, J.) (finding no likelihood of success on misappropriation claim where "[t]here is evidence that the departing employees looked at ESA's files, but no evidence has been presented that any files were copied by the departing employees," including

because "no DVA employee had access to [the plaintiff's] network after [their departure date]").

**Mr. McGarvey Did Not Access Atos Servers While Employed at Unisys.**   Unable to support misappropriation based on Mr. McGarvey's preparation of a transition package for his successor, Unisys next tries to create an inference of misappropriation by pointing to records that show Mr. McGarvey allegedly accessed Atos webpages in the months leading up to his decision to leave Unisys.  Marshall Decl., Dkt. 4-6, ¶¶ 17-19.  These arguments likewise fail.

To start, Unisys appears to suggest that Mr. McGarvey logged into Atos's OneDrive server in October 2022.  *Id.* ¶ 17.  That is incorrect.  As noted throughout, Mr. McGarvey participated in the Unisys's BYOD program, using a personal laptop as his Unisys-approved device for the majority of his employment at Unisys.  *Id.* ¶¶ 19-28.  Unsurprisingly, his personal laptop continues to have old bookmarks and shortcuts that Mr. McGarvey had created during his prior employment with Atos.  On October 24, 2022, Mr. McGarvey was using his laptop and accidentally clicked one of his old links, which took him to the log in page for the Atos OneDrive.  *Id.* ¶¶ 79-83.  Having no reason to go to that page—let alone no credential that would let him log in—Mr. McGarvey quickly navigated away from that page.  *Id.*  Unisys's own records confirm this fact, showing that Mr. McGarvey never made it past the log in page.  *Id.* ¶ 81.

Similarly, Unisys's suggestion that Mr. McGarvey was acting improperly because he accidentally visited the Atos benefits page in late 2022 is without basis.  At that time, Mr. McGarvey was planning a trip to Disney with his family.  *Id.* ¶¶ 84-85.  While attempting to locate Unisys's benefits page to help book that trip, Mr. McGarvey's search accidentally led him to the Atos benefits page.  *Id.*  When he realized that he was on the incorrect website, he immediately closed it and continued his search until he located Unisys's page and booked his family's trip.  *Id.*

Accordingly, there is no credible basis upon which Unisys can conclude that records of

either of these activities provide even indirect evidence of misappropriation.

**Mr. McGarvey's Email Forward Does Not Support Misappropriation.**  Unisys's final claimed evidence of bad acts by Mr. McGarvey relates to a record entry showing that Mr. McGarvey forwarded an email to himself on January 10, 2023, with the file name "FW: ATOS: VOTRE RELEVE DE DROITS A ACTIONS DE PERFORMANCE / YOUR PERFORMANCE SHARE RIGHTS ACCOUNT STATEMENT."  Marshall Decl. ¶ 20.  But as that email confirms, it has nothing to do with Unisys, let alone Unisys's claimed trade secret information.  Instead, the email consists of Mr. McGarvey's personal compensation email from **2019** when he was employed at Atos, and Mr. McGarvey was forwarding it to himself to keep as part of his tax records. McGarvey Decl. ¶¶ 87-90, Ex. 2.

Accordingly, this email cannot—under any circumstances—support Unisys's misappropriation claim against Mr. McGarvey.  And with no other claimed evidence related to Mr. McGarvey, Unisys's TRO request as to him must therefore be denied.

ii.     *Mr. Gilbert Did Not Take Any Unisys Trade Secrets or Confidential Information*

Unisys's allegations that Mr. Gilbert misappropriated trade secrets are even thinner than those it attempts to mount against Mr. McGarvey.  Specifically, Unisys's papers identify three actions by Mr. Gilbert that Unisys claims will prove actual misappropriation: (a) an email Mr. Gilbert sent in November 2022 to Emmanuel Torres, even though at the time that individual was in fact a Unisys employee; (b) a messaging conversation between Mr. Gilbert and Atos prior to Mr. Gilbert's departure from Unisys; and (c) a single instance in which Mr. Gilbert's Unisys laptop was used to access his personal Google Drive.  TRO Mem. at 7-11.  Each again fail to support

Unisys's trade secrets claim.[5]

**Mr. Gilbert Did Not Email Information Outside of Unisys in November 2022**.  Despite

having forensic records revealing all of Mr. Gilbert's activities on his Unisys-issued laptop, the

only instance Unisys alleges shows Mr. Gilbert sharing secret information outside of Unisys is a

single email in November 2022 that Mr. Gilbert forwarded to Emmanuel (Ronald) Torres at the

email address Ronald.torres@atos.net.  TRO Mem. at 7, ex. 1.  But as Unisys certainly knows that

accusation is not just unfounded, it is unquestionably incorrect.  Although Mr. Torres previously

worked with Mr. Gilbert at Atos, importantly, in November 2022 when this email was sent, Mr.

Torres **worked at Unisys**.  Gilbert Decl. ¶¶ 39-45.  When forwarding the email at issue from his

cell phone, Mr. Gilbert mistakenly forwarded it to Mr. Torres's prior Atos email, which was an

outdated contact that was still in his phone.  *Id.*  Mr. Gilbert immediately received a bounce back

that Mr. Torres's Atos email was not a valid address and that his email had therefore not been

delivered.  *Id.*  Realizing his mistake, he then forwarded the email to Mr. Torres's valid Unisys

email address, as he had intended to do so all along.  *Id.*

**Mr. Gilbert's January 19 Conversation Does Not Support Misappropriation**.  Unisys

next resorts to repeatedly relying upon a January 19, 2023 messaging exchange in which Mr.

---

[5] Although Unisys fails to identify any action by Mr. Gilbert beyond the three noted herein to support its claims or request for a TRO, Mr. Gilbert has acted promptly, diligently, and voluntarily to determine whether he continued to have possession of Unisys materials after his employment ended on January 27, 2023.  To the best of his recollection, he is aware that he continued to have access to some Unisys information after that date.  He has not, however, accessed that information, used it in any way on behalf of Atos, or disclosed it to anyone at Atos.  Gilbert Decl. ¶¶ 61-65. Nor does Mr. Gilbert believe that any information in his possession qualifies as a trade secret or confidential information.  Mr. Gilbert nevertheless discloses the existence of this information in good faith.  He further states that he has taken all steps necessary to sequester from himself this information in light of the lawsuit.  *Id.*  To the best of his knowledge, he no longer has access to these materials and will continue to take all steps to ensure it stays that way until this case is resolved.

Gilbert told Atos "I spent last 2 years in the model Atos is trying to get to, so I know what works and what doesn't." TRO Mem. at 8-9, ex. 24. This too is taken out of context by Unisys to try to create malfeasance where none exists.

Prior to Mr. Gilbert joining Unisys's DWP/DWS team, Unisys had hired McKinsey to perform consulting work and discuss ways to reorganize the business structure to reduce redundancies in how separate business divisions reported their profits and loss statements. Gilbert Decl. ¶¶ 53-55. When discussing his return to Atos, Atos mentioned to Mr. Gilbert that Atos had recently contracted with McKinsey to perform very similar consulting work. *Id.* It was in the context of that understanding that Mr. Gilbert mentioned he had experience with the model of division-specific profit and loss reporting when he was talking to Mr. Walz on January 19. *Id.* Mr. Gilbert was therefore not referring to any proprietary Unisys method or information, nor would he have any reason to. *Id.* He has not shared, and has no intention of sharing, any Unisys trade secret or confidential information with Atos. *Id.*

**Mr. Gilbert's Family Accessed His Google Drive for Personal Reasons.** Unisys's final attempt to show that Mr. Gilbert must have been misappropriating unidentified trade secrets is based on allegations that Mr. Gilbert accessed his personal Google Drive on January 22, 2023, and that such activity must reflect misconduct because it is out of character for Mr. Gilbert and Unisys does not use Google Drive. TRO Mem. at 9. This too fails to pass muster.[6]

---

[6] Unisys argues that Mr. Gilbert's actions in wiping his Chrome Browser and deleting emails prior to his departure evidence efforts to cover up misappropriation. That is incorrect. Mr. Gilbert deleted his Chrome Browser history prior to leaving Unisys to ensure that sensitive personal information—like stored credit card information or passwords—did not remain on a laptop over which he would no longer have control. Gilbert Decl. ¶ 57. Similarly, Mr. Gilbert believes that Unisys's reference to his deletion of emails refers to nothing more than his deletion of emails that were already in his "Trash, Deleted, Personal and Junk" folders. *Id.* ¶ 58. He does not recall performing any mass deletion of emails from his Inbox or Sent folders. *Id.* Mr. Gilbert took similar actions in clearing his browser history and trash/deleted, personal, and junk folders when leaving

In fact, it was not actually Mr. Gilbert who accessed his Google Drive on January 22, 2023, as Unisys claims.  Instead, it was Mr. Gilbert's daughter, who is a senior in high school.  Gilbert Decl. ¶ 59.  Specifically, using Mr. Gilbert's laptop, Mr. Gilbert's daughter and wife accessed her father's Google Drive to obtain photographs she wanted to include in her high school yearbook and then transferred them from a family member's account to Mr. Gilbert's account to sort through them.  *Id.*  At no point in this process did anyone access or copy Unisys information, let alone trade secrets or confidential information.  Unisys's reliance on records related to Mr. Gilbert's Google Drive is therefore misplaced and does not support its claims.

### c.      *There Is No Threatened Misappropriation*

Unisys also fails to show threatened misappropriation through inevitable disclosure.  As was the case in *Freedom Medical* and *First Health Group*, Defendants do not have access to or have already based on Unisys's own theory allegedly disclosed the only purported trade secrets, so their reliance on those secrets is not possible, let alone inevitable.  Gilbert Decl. ¶¶ 39-65; McGarvey Decl. ¶¶ 48-52.  Even if they could access the Unisys information they allegedly downloaded, moreover, as Mr. Gilbert and Mr. McGarvey each explained to Unisys in their exit interviews, information on Unisys products and services have no value to Atos because Atos's DWS offerings operate on entirely different platforms to Unisys, meaning there would be no need to use the alleged trade secrets even if Defendants could access them.  McGarvey Decl. ¶¶ 96-118; ; *see E.R. Squibb & Sons, Inc. v. Hollister, Inc.*, No. 91-CV-203, 1991 WL 15296, at *8 (D.N.J. Feb. 5, 1991) (finding no likelihood of inevitable disclosure when alleged trade secret information related to "products [that] are not compatible" with the new employer's products and thus was not useful to new employer); *see also ADP, Inc. v. LaCivita*, No. 21-CV-20001, 2022 WL 5177374,

---

Atos because, again, he feels they are necessary to ensure personal information does not remain on computers over which he will no longer have control.  *Id*. ¶¶ 57-58.

at *5 n.8 (D.N.J. June 30, 2022) (finding no inevitable disclosure when employee no longer worked in geographical area to which alleged trade secrets would be relevant).

Likely knowing that it cannot show actual misappropriation, Unisys argues in the alternative that a temporary restraining order is necessary to avoid threatened misappropriation. Unisys is again incorrect.

Although Pennsylvania law recognize claims for threatened misappropriation, the inevitable disclosure doctrine is not a catchall for the absence of actual misappropriation that precludes employees from taking their knowledge and experience to a competitor, as Unisys's motion tries to suggest.  TRO Mem. at 20-21.  In fact, Pennsylvania has long recognized that "[a] man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not the property of his employer and the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer."  *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 419 Pa. 248, 260 (1965); *see also Cerro Fabricated Prods. LLC v. Solanick*, 300 F. Supp. 3d 632, 649 (M.D. Pa. 2018) ("A trade secret does not include a worker's aptitude, skill, dexterity, or his manual and mental ability." (quotations and citations omitted)).

Instead, the inevitable disclosure doctrine applies only where, based on the defendant's position, the new employer "could not operate or function without relying on [the plaintiff's] alleged trade secrets."  *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 236 (M.D. Pa. 2001).  Unisys again falls far short of meeting its burden to show inevitable disclosure here.

Again—importantly—Unisys never actually identifies the actual secrets that it claims Mr. Gilbert and Mr. McGarvey will be unable to stop themselves from revealing to Atos.  This is not

surprising because a lot of what Unisys is generally trying to claim is secret is already publicly available in Unisys's patent applications, presentations, third-party analyst reports, and Unisys's own financial disclosures that it submits yearly as a public company.

It is also not surprising because, even if Mr. Gilbert or Mr. McGarvey had access to Unisys's propriety information, it would be of little to no use to them at Atos. Atos had already undergone its own modernization prior to when Mr. Gilbert and Mr. McGarvey left Atos. In fact, it was that experience that Mr. McGarvey understood made Unisys interested in hiring him in the first place. McGarvey Decl. ¶ 14. Equally important, even if how Unisys provides DWP/DWS solutions could arguably be proprietary despite public disclosures about it (i.e., patents), those inner workings are of little use to Atos, which has its own platforms, software, and products.

At bottom, Unisys's inevitable disclosure argument is therefore nothing more than a suggestion that no one can ever work for their prior employer's competitor because there is some infinitesimal risk that he or she would disclose something proprietary. That is not the law, nor should it be. Mr. Gilbert and Mr. McGarvey are not bound by noncompete agreements. Unisys itself benefited two years ago from Defendants' freedom to move within the market when Unisys recruited them from Atos. To argue that, after recruiting these individuals away from Atos, and without asking them to enter into noncompete agreements, Unisys should be able to use the Court's equitable power to force Mr. Gilbert and Mr. McGarvey out of the market is unsupportable. The motion should be denied.

## 2. *Unisys Is Not Likely to Succeed in Establishing Ongoing or Future Breach of Defendants' Employment Contracts*

In addition to trade secrets misappropriation, Unisys seeks a TRO based on its claims that Mr. Gilbert and Mr. McGarvey allegedly breached their confidentiality agreements and that Mr.

Gilbert allegedly breached the non-solicitation provisions in his employment contracts.   Unisys

again fails to show that it is likely to succeed on the merits of either claim.

To start, by its plain terms, the confidentiality provision in Defendants' contracts prohibits

only the:

> transfer [of] any information that is not generally known outside the Company or
> that is designated by the company as 'Confidential' or 'Restricted Confidential' or
> is similarly designated, to any person, firm or organization not authorized by the
> Company to receive it, or to use any of such designated information other than for
> the sole benefit of the Company.

TRO Mem. at ex. 8 ¶ 1(d), ex. 9 ¶ 1(d).   As discussed above, Unisys has failed to show a single

instance where information—confidential or otherwise—has been shared with anyone outside

Unisys by either Mr. Gilbert or Mr. McGarvey.   And neither Mr. Gilbert nor Mr. McGarvey has

ongoing access to any Unisys documents, including confidential information, that they could

disclose either now or in the future.   Gilbert Decl. ¶¶ 61-65; McGarvey Decl. ¶ 52.   There is

therefore no actual or threatened breach of the confidentiality provision that justifies enjoining

Defendants from working for Atos or any other Unisys competitor.   *See TES Franchising v.*

*Dombach*, No. 10-CV-0017, 2010 WL 3946274, at *12 (E.D. Pa. Oct. 7, 2010) (denying injunction

for alleged breach of a duty of loyalty when the plaintiff had only shown potential for past breach

and "there is no threatened breach to preliminarily enjoin").

Similarly, putting aside the reasonableness or validity of the non-solicitation provision or

whether Unisys could establish breach of that provision by Mr. Gilbert based on his past conduct,

which Defendants expressly dispute, any alleged breach admittedly occurred in the past and Mr.

Gilbert has already agreed to Unisys's request that he not solicit Unisys employees to the extent

prohibited by the non-solicitation provisions during the pendency of this lawsuit.   There is

therefore no threatened breach of either the confidentiality or solicitation provisions that Unisys is

likely to establish on the merits, and Unisys's request for injunctive relief for its breach of contract claims should be denied.

**B.      Unisys Fails to Show That the Remaining Factors Favor a Temporary Restraining Order**

Because Unisys has not established a likelihood of success on the merits of its claims that would justify injunctive relief, the Court need not resolve the remaining preliminary relief factors and should deny Unisys's application for a TRO.  *See Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) ("The moving party's failure to show a likelihood of success on the merits must necessarily result in the denial of a preliminary injunction." (internal quotations and citations omitted)); *Contour Data*, 2021 WL 5536266, at *15 (denying preliminary injunction on trade secrets claims when plaintiff had not shown likelihood of success on the merits, without analyzing remaining factors).  Should the Court nevertheless consider those factors, each also militate against granting a TRO.

**1.      *Unisys Fails to Show It Would be Irreparably Harmed Absent a TRO***

As noted above, "[a] plaintiff seeking a preliminary injunction must make a clear showing of immediate irreparable injury." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 358 (3d Cir. 1980) (citation omitted).  The injury must constitute "potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted).  The preliminary injunction "must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  And "the risk of irreparable harm must not be speculative." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000).  Unisys failed to satisfy its burden here with respect to either its trade secrets or breach claims.

To start, as discussed above, Defendants do not have ongoing access to Unisys's

information and have provided declarations under oath that they will not use, access, or disseminate Unisys's information.  Gilbert Decl. ¶¶ 61-65; McGarvey Decl. ¶ 52.  Thus, even if Unisys had identified actionable takings by either Mr. Gilbert or Mr. McGarvey—which they did not (see *supra* § A.1)—Unisys would still be unable to show the type of immediate or ongoing harm that required to obtain injunctive relief.  *See Ecosave Automation*, 540 F. Supp. 3d at 502 n.1 (finding no irreparable harm when plaintiff "failed to present evidence that any Defendant is currently using or threatening to use any trade secrets or confidential information"); *ASI Bus. Sols., Inc. v. Otsuka Am. Pharm., Inc.*, 233 F. Supp. 3d 432, 441 (E.D. Pa. 2017) (denying preliminary injunction when the plaintiff could not show that risk of disclosure was "immediate" or even "imminent"); *Schuylkill Valley Sports*, 2020 WL 3167636, at *16 (finding movant's conclusory statements about harm it will suffer could not establish irreparable harm).  Unisys cannot avoid that conclusion by claiming that Mr. Gilbert and Mr. McGarvey ***might*** possess or disclose trade secrets, or based on the mere fact that they now work for Unisys's competitor.  Courts are clear that "[t]rade secrets 'will not be protected by the extraordinary remedy of injunction on mere suspicion or apprehension of injury;" instead, "[t]here must be a substantial threat of impending injury before an injunction will issue.'"  *Ecosave Automation*, 540 F. Supp. 3d at 502 (quoting *National Risk Mgmt., Inc. v. Bramwell*, 819 F. Supp. 417, 429, 432 (E.D. Pa. 1993)).  The mere fact that Mr. Gilbert and Mr. McGarvey work for Unisys's competitor does not satisfy that burden.  *See Schuylkill Valley Sports*, 2020 WL 3167636, at *16; *CertainTeed Ceilings Corp. v. Aiken*, No. 14-3925, 2014 WL 5461546, at *13 (E.D. Pa. Oct. 24, 2014).  Unisys's TRO request should therefore be denied.

The same holds true when evaluating irreparable harm related to the breach claims.  For the same reasons, there simply is no credible argument that an injunction is needed to prevent

breach of the confidentiality agreement.  Mr. Gilbert has likewise stated that he has abided by—and will continue to abide by—the terms of his non-solicitation agreement.  Without the threat of a future breach of either restrictive covenant, there is no harm that cannot be remedied through money damages in the unlikely event that Unisys succeeds on either claim.  Injunctive relief is therefore unavailable.  *See Ecosave Automation*, 540 F. Supp. 3d at 503 n.4 (finding no irreparable harm from past breaches of restrictive covenants when "[a]ny conduct of the five defendants in question that may have breached their non-competes occurred in the past and can be compensated with money damages"); *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 804-05 (E.D. Pa. 2011) ("The requirement of imminence [of a breach] is important because a preliminary injunction is issued early in a proceeding, and '[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief. Therefore, if a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief.'" (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995)).  Unisys's request for a TRO should be denied.

### 2.    *Unisys's Requested Injunction Should be Denied because It Places Undue Hardship on Mr. Gilbert and Mr. McGarvey*

The balance of hardships clearly weighs against granting Unisys's request for a TRO, or any other injunctive relief.  Although Unisys attempts to downplay its request as "not seeking to preclude [Defendants] from lawful employment," that is in effect what its request seeks to do.  TRO Mem. at 26.  Indeed, Unisys seeks not only to prohibit Mr. Gilbert and Mr. McGarvey from working in Atos's DWP/DWS division, but also seeks to preclude them from working at ***any*** Atos affiliate or ***any*** Unisys competitor.  TRO Mem. at 1.  Granting such a request would effectively put Mr. Gilbert and Mr. McGarvey out of their chosen field of employment, one in which they have spent decades building their expertise, knowledge, and reputation—all of which existed long

before they ever joined Unisys. This in turn would have a serious financial impact on not just Mr. Gilbert and Mr. McGarvey personally, but also their families as both individuals are the sole and primary breadwinners in their households, respectively, supporting not just spouses but also young children. Gilbert Decl. ¶¶ 72-77; McGarvey Decl. ¶¶ 119-125.

By comparison, any alleged harm to Unisys from denying the TRO is nonexistent. Defendants do not have access to Unisys's documents, let alone the trade secrets Unisys fails to actually identify. Gilbert Decl. ¶¶ 61-65; McGarvey Decl. ¶ 52. Defendants have also not disclosed any Unisys information or solicited Unisys employees. In fact, Mr. Gilbert and Mr. McGarvey have both repeatedly agreed in these papers to continue their practice of not engaging in any of the misconduct that Unisys's seeks to enjoin. There is therefore no ongoing or future threat of misappropriation or breach of contract that could conceivably harm Unisys.

Instead, the only "harm" that Unisys's Complaint and papers evidence is that Mr. Gilbert and Mr. McGarvey exercised their free will to leave Unisys. Those lawful decisions are not cognizable injuries or hardship under any circumstances. And Unisys complaints about them ring particularly hollow given that it was Unisys who just two years ago heavily recruited Mr. Gilbert and Mr. McGarvey away from Atos to use the experience and knowledge Mr. Gilbert and Mr. McGarvey gained from decades of working at Atos.

Simply put, courts have routinely found that the balance of hardships weighs against injunctive relief when the plaintiff has not shown any ongoing threat of harm while the defendant-employee would lose his or her job and livelihood. *See, e.g.*, *Schuylkill Valley Sports*, 2020 WL 3167636, at *17-18 (finding balance of hardships favored denial of injunction when the plaintiff had not shown likelihood of success or irreparable harm while harm to the defendant-employee would be "great as he will once again be without a job and income," particularly during the

economic downturn of the COVID-19 pandemic, and because new employer would be forced "to expend time and expense to find other employees"); *Colorcon*, 792 F. Supp. 2d at 805 (finding "the equities weigh strongly against issuance of the injunction" when the defendant "would likely lose her job" and the new employer "would likely lose an employee it values"); *Mettler-Toledo, Inc. v. Acker*, 908 F. Supp. 240, 248-49 (M.D. Pa. 1995) (finding balance of equities "clearly supports denial of the requested injunction" when plaintiff "appeared to have no protectible interest in [trade secrets]" while injunction would force defendant to lose income from business that he used to support his family). The circumstances here similarly support a finding that the balance of hardships favors Defendants and requires denial of Unisys's requested relief.

### 3. The Public Interest Does Not Favor Granting Injunctive Relief

Finally, the public interest favors denial of preliminary relief. Although generally there is a public interest in protecting trade secrets and enforcing contracts, there is no risk of misappropriation or breach of contract here that would justify the public's interest in the particular relief Unisys is requesting. By comparison, courts in the Third Circuit have recognized a strong public interest in promoting free competition between companies and the right of employees to change employment. *See, e.g.*, *Schuylkill Valley Sports*, 2020 WL 3167636, at *19 ("In the absence of any evidence that SV Sports' confidential information is being improperly used or disclosed, the public interest in preserving competition weighs in favor of denying the injunction that would significantly limit CI's ability to compete."); *Coventry First, LLC v. Ingrassia*, No. 05-CV-2802, 2005 WL 1625042, at *12 (E.D. Pa. July 11, 2005) ("[A]s a matter of public policy, Pennsylvania courts are reluctant to 'enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade.'" (citation omitted)). Courts have also recognized the public interest in avoiding unemployment and allowing employees to work in positions that suit their specific talents, particularly where, as here, there is no valid

noncompete agreement to enforce.  *See, e.g.*, *Colorcon, Inc.*, 792 F. Supp. 2d at 805 ("[I]t would run counter to the public interest to leave Lewis unemployed or require her to work at a job that does not suit her talents. . . . [I]t would [also] be contrary to the public interest to enjoin her employment where the Court has already determined that the [noncompetition] agreement is not being violated and would not be enforceable if it were.").

### C.       If the Court Determines Preliminary Relief is Necessary, Unisys Should Be Required to Post Bond

Although preliminary relief is not justified, to the extent the Court nonetheless determines that Mr. McGarvey and/or Mr. Gilbert should be enjoined from working for Atos or any Unisys competitors, the Court should require Unisys to post a bond as security in the event Defendants ultimately prevail.  Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  In general, a bond should be set at the amount of damages the wrongfully enjoined party could recover upon dissolution of the injunction.  *See NCAA v. Governor of New Jersey*, 939 F.3d 597, 606-07 (3d Cir. 2019) (adopting majority rule of sister circuits that a wrongfully enjoined party is presumptively entitled to provable damages up to the bond amount).

Here, should Unisys's requested TRO issue, Mr. Gilbert and Mr. McGarvey will lose their employment at Atos and suffer lost wages and the benefit of investing those wages until that restriction is dissolved.  Thus, to the extent the Court enjoins Defendants from working for Atos's DWS business or any other competitor of Unisys, it should at a minimum require a bond in the amount of Defendants' combined lost wages for the duration of the TRO, plus interest.  Further, to the extent the Court issues a preliminary injunction extending the bar on Defendants'

employment, it should require Unisys to post bond in the amount of Defendants' lost wages, including likely bonuses and raises, for at least two years, plus interest. Such a security will help protect Defendants from the irreparable harm caused by the issuance of Unisys's requested relief.

**D.     The Court Should Deny Unisys's Request for Expedited Discovery**

Unisys's request for expedited discovery is similarly without merit. Because Unisys has not shown that it is entitled to a TRO under the same factors applied to motions for preliminary injunctions, there is no need for expedited discovery in support of Unisys's planned motion for a preliminary injunction. *See Schuylkill Valley Sports*, 2020 WL 3167636, at *19 (denying request for expedited discovery when "no preliminary injunction hearing will be scheduled and the request for injunctive relief [was] denied"). Indeed, Unisys has already conducted extensive forensic analysis of Defendants' conduct on Unisys-provided computers and operating systems, so Unisys can hardly be heard to complain that it lacked meaningful opportunity to develop its claims before filing for a TRO. Additional discovery is therefore not needed to confirm or deny whether Defendants have possession of Unisys documents.

In any event, Unisys's requested discovery is unnecessary, unduly burdensome, and overly broad, and should be rejected on that basis. Unisys states that it seeks all of Defendants' communications with Atos since July 2022; information related to the whereabouts of Unisys materials that Defendants allegedly copied or retained; Mr. Gilbert's communications with Unisys employees; and unrestricted depositions of Defendants. TRO Mem. at 29. However, Defendants have already confirmed under oath that they have not access, shared, or used any Unisys information with anyone outside of Unisys, and that they have no intention to do so. Gilbert Decl. ¶ 61-65; McGarvey Decl. ¶¶ 52, 93-94. Mr. Gilbert has also confirmed that he has not solicited other Unisys employees to join Atos, but in fact, even in the context of the one example Unisys offers to claim otherwise, has been upfront about his understanding that he cannot do so for a year

after leaving Unisys.   Gilbert Decl. ¶¶ 66-71.   To the extent Unisys disputes these sworn statements, it may seek documents and information during regular fact discovery.  A preliminary injunction is not a basis to try the merits of a case before it has begun, and the Court should not permit Unisys to seek plainly overbroad discovery, including unrestricted "depositions of Defendants."  *See Philadelphia Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*, 1998 WL 404820, at *2 (E.D. Pa. July 15, 1998) (stating that "courts generally deny motions for expedited discovery when the movant's discovery requests are overly broad," and denying motion to seek discovery when the plaintiff had not set "definitive limitations on the scope of the sought-after discovery").

Accordingly, the Court should deny Unisys's request for expedited discovery.

## **CONCLUSION**

For the foregoing reasons and based on the evidence of record, Defendants respectfully request that Unisys's Application for a Temporary Restraining Order be denied.

Dated:  February 21, 2023

**DEFENDANTS LEON MR. GILBERT AND MICHAEL MR. MCGARVEY**

*/s/ Gerald J. Stubenhofer, Jr.*

Gerald J. Stubenhofer, Jr.(PA Bar No. 72921)
Cameron J. Comer (PA Bar No. 329152)
260 Forbes Avenue, Suite 1800
Pittsburgh, Pennsylvania 15222
Telephone: 412 667 6000
Facsimile: 412 667 6050
gstubenhofer@mcguirewoods.com
ccomer@mcguirewoods.com

Brian C. Riopelle (*Pro hac vice pending*)
Christopher M. Michalik (*Pro hac vice pending*)
Amanda L. DeFord (*Pro hac vice pending*)
Matthew G. Rosendahl (*Pro hac vice pending*)
MCGUIREWOODS LLP
800 East Canal Street
Gateway Plaza
Richmond, VA 23219
Tel: (804) 775-1000
Fax: (804) 775-1061
Email: briopelle@mcguirewoods.com
Email: cmichalik@mcguirewoods.com
Email: adeford@mcguirewoods.com
Email: mrosendahl@mcguirewoods.com

*Attorneys for Defendants Leon Mr. Gilbert and Michael Mr. McGarvey*

36

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system on this 21st day of February, 2023, which constitutes service on Plaintiff's counsel of record, who are registered users of the CM/ECF system pursuant to Fed. R. Civ. P. 5(b)(2)(E).


*/s/ Gerald J. Stubenhofer, Jr.*